[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAR 16 2000
THOMAS K. KAHN
CLERK

No. 97-9078

D.C. Docket No. 96-00155-CV-2-(HL)

TERRY MICHAEL MINCEY,

Petitioner-Appellant,

versus

FREDERICK J. HEAD,

Respondent-Appellee,

Appeal from the United States District Court
for the Middle District of Georgia

**(March 16, 2000)**

Before TJOFLAT, BIRCH and DUBINA, Circuit Judges.

TJOFLAT, Circuit Judge:

In this case, Petitioner Terry Mincey seeks a writ of habeas corpus vacating his convictions for murder, aggravated battery, and armed robbery, and, alternatively, setting aside the death sentence he received for the murder. His principle grounds for relief (among twenty-five grounds) are that the police obtained incriminating statements from him after he asked for a lawyer, that the prosecution withheld evidence favorable to his defense, and that his attorneys rendered ineffective assistance of counsel. The district court denied relief. We affirm.

## I.

On the afternoon of April 12, 1982, Terry Mincey drove his motorcycle to Robert Jones' trailer-home in the Cross Creek Trailer Park on the outskirts of Macon, Georgia. After parking his motorcycle, he joined Jones in Jones' 1969 Ford Mustang automobile and together they drove to the Forest Place Trailer Park, located a short distance away, to meet Mincey's girlfriend. When they arrived, they encountered "a bunch of people" standing at the entrance of the trailer park. One was Timothy Jenkins, who lived at the park with his wife of three weeks. Mincey and Jenkins knew each other; Jones and Jenkins were barely acquainted. All three were the same age, around twenty-two. As the they stood around talking, they decided to rob a drug dealer they knew in Macon. Each was armed: Mincey was carrying a .38 caliber semi-

2

automatic Llama pistol, Jones a .12 gauge bolt-action shotgun, and Jenkins a .38 caliber Arminius revolver.

With Jones behind the wheel, they drove in Jones' Mustang to Macon. The drug dealer they intended to rob was not at his usual place of business, so they went to Jones' trailer-home to plan their next step. At the trailer-home, Mincey and Jenkins talked about their need for cash. While that discussion was taking place, Mincey and Jones, using a hacksaw blade, sawed off the barrel of Jones's shotgun to twelve inches and altered the stock so that it resembled a pistol grip. The talk then turned to robbery, and they headed back to Macon in Jones' Mustang. En route, they passed a Ramada Inn, and Jenkins suggested that they rob it. Mincey and Jones rejected the idea, however, noting that the area was too congested. An Exxon gas station appeared to be a good prospect, but it was closed. They next considered a Kwickee Food Store, but Mincey quickly dismissed it; a store employee was one of Mincey's trailer park neighbors.

Time was running out; it was after 10:00 p.m. and most establishments were closing. As they passed a Mini Food Store, located at the corner of Houston Avenue and Hartley Bridge Road, Mincey had Jones turn the car around so that he, Mincey, could go in and "case" the store. Jones pulled into the parking lot, and Mincey entered the store and purchased a pack of gum. After observing who was in the store,

a cashier and two teenagers, Mincey returned to the car, and they parked on a dirt road a short distance away to discuss what to do next. Mincey proposed that they rob the Mini Food Store. When asked what to do about the two teenagers, Mincey said (according to Jones and Jenkins, who copped pleas and testified for the prosecution at Mincey's trial), "we ain't going to leave no bunch of witnesses. [I will] have to waste them." Jenkins replied, "we ain't going back and shoot nobody," to which Mincey responded, "if you are talking about not wasting nobody, you are in the wrong [expletive] car for that."

With that, the conversation ended, and they decided to rob the Mini Food Store. They drove there in silence and parked in front of the store, leaving the motor running. Mincey and Jenkins got out of the car; Jones remained behind the wheel. Jenkins positioned himself beside an ice machine outside the store; from there he could see the counter area through the storefront window. Mincey entered the store. As he went through the door, Mincey pulled his pistol out from under his coat. The two teenagers he had seen before, Mischell McCook, who was fourteen, and her brother Bubba, who was fifteen, were still in the store. Brandishing his weapon, Mincey told them to get into the car parked outside; then he instructed Paulette Riggs, the cashier, to empty the contents of the cash register into the bag he was carrying.

4

When the McCook siblings exited the store, Jenkins, who was still standing by the ice machine, told them to stay put. At that moment, Russell Peterman, a Bibb County firefighter, driving a Ford pick-up truck, pulled up to the gas pumps in front of the store and began filling his tank. While he was pumping gas, Mincey escorted Riggs from the store at gun point, told her to stand beside Jenkins, and headed towards Peterman. As he approached Peterman from behind, Mincey said, "come go with me." Peterman turned to see who was speaking and found Mincey pointing a gun at him. Surprised, Peterman failed to respond, and, as Peterman testified at the trial, Mincey exhibited a "flash of anger" and said "you think I'm joking, don't you." Mincey then fired once, hitting Peterman in the chest.[1] Peterman hit the ground and lay there motionless but still conscious. From point-blank range, Mincey fired again, at Peterman's head.[2] As the second shot rang out, the McCook siblings began running toward a field behind the store.

---

[1] At Mincey's trial, Peterman was unable to identify Mincey as the man who shot him; all he could say was that the man was a young white male. A state criminalist, however, testified that, in his opinion, based on ballistics tests performed at the State Crime Laboratory, the bullets that struck Peterman were fired from Mincey's .38 Llama pistol.

[2] Peterman somehow survived. The second shot entered the left side of his head and traveled across his face leaving him completely blind in one eye and with forty percent of his vision in the other.

5

Believing that the second shot had killed Peterman, Mincey headed for the Mustang. As he was going toward the car, Riggs started to run (in the direction of the field behind the store), and Mincey shot at her. The bullet entered her left ear, and she fell near a dumpster behind the store. Mincey walked to where Riggs was lying, shot her in the head, and ran to the Mustang. Jenkins was already in the car, and, after Mincey got in, the three men sped away. As they drove west on Hartley Bridge Road, Jones asked Mincey if Riggs and Peterman were dead, and Mincey answered, "yes, they are dead. I know they are dead, I shot both of them." Mincey then asked Jones and Jenkins what they had done with the two teenagers. Jenkins answered that they were "back there," to which Mincey responded, "what you mean? In the trunk?" Jenkins told him, "no, back at the store." Realizing that the teenagers had gotten away, Mincey replied, "well, I just got a death sentence . . . a murder rap for $40."

As the robbery was taking place, Larry Ballard, who lived next door to the Mini Food Store and had retired for the night, heard two gun shots. He got out of bed, told his wife to call the sheriff, and ran out of the house.[3] Once outside, he heard someone scream and then another gun shot. Moments later, he saw two white males get into

---

[3] The Bibb County Sheriff's office received her call at 10:43 p.m., and officers were dispatched to the scene.

a distinctive looking Mustang – the hood was missing, the car was covered with primer paint, and the muffler was loud – and speed away.

At 10:50 p.m., two Bibb County Sheriff's officers arrived at the store, obtained a detailed description of the getaway car, learned from a passerby that it belonged to Jones, and, a short time later, determined his address. Meanwhile, Jones drove his Mustang to the Cross Creek Trailer Park. There, Mincey got out, retrieved his motorcycle, and rode it to his mother's trailer-home at the Hill-N-Dale Trailer Park. After letting Mincey out, Jones drove to the Forest Place Trailer Park and dropped Jenkins off. After that, Jones threw his shotgun into a nearby creek and headed west to the trailer-home of a close friend, Joey Holcomb, in adjoining Crawford County.

A sheriff's office investigator who had been dispatched to the scene of the crime, Bob Boren, knew Jones, and was acquainted with his criminal record. Jones had done time in a Georgia penitentiary for crimes committed in Bibb County: armed robbery, burglary, and theft of automobile parts. Boren also knew Holcomb.[4] Suspecting that Holcomb might know of Jones' whereabouts, Boren contacted Holcomb's sister who said that her brother and Jones were still "running" together. She gave Boren directions to Holcomb's trailer-home, and at 2:30 a.m. the following

---

[4] How Boren had come to know Holcomb is not disclosed by the record.

day, April 13, Boren found Jones there and placed him under arrest. After being advised of his <u>Miranda</u> rights, Jones told Boren about the robbery and shootings at the Mini Food Store. Jones said that Mincey was the triggerman and that, when he dropped Mincey off at the Cross Creek Trailer Park, Mincey had the gun and his share of the robbery proceeds in his possession. Jones gave Boren a telephone number where Mincey could be reached and described Mincey's motorcycle.

Boren traced the phone number to a trailer-home at the Hill-N-Dale Trailer Park. Shortly after 4:15 a.m., the sheriff dispatched several officers to the trailer park. They located the trailer-home and Mincey's motorcycle; it was parked in front. A short time after the officers arrived, a woman stepped out of the trailer-home. An officer asked her who she was, and she replied that she was Mrs. Mincey and that she was on her way to visit a neighbor. The officer asked her if she knew where her son was, and she replied that Mincey was asleep inside. She inquired why the police were there, and the officer said that her son was a suspect in an armed robbery and a homicide. At the officer's request, Mrs. Mincey went to the neighbor's trailer-home, called her son on the telephone, and handed the phone to the officer. He informed Mincey that he was a suspect in a homicide and an armed robbery and asked him to step outside. Mincey did so, was placed under arrest, and was taken by Boren and sheriff's office investigator Clifton Spires to the Bibb County Law Enforcement

8

Center (the "LEC"). During the trip to the LEC, Boren read Mincey his <u>Miranda</u> rights. At the LEC, Mincey was informed of his rights once again. After that, he decided to talk and made several incriminating statements.

Later in the day, the sheriff's office obtained a warrant to search Mrs. Mincey's trailer-home.[5] Inspector Boren executed the warrant at 4:20 p.m. With Mrs. Mincey's assistance, he seized a .38 caliber Llama pistol, which had been placed in a plastic bread wrapper and hidden under the kitchen sink.[6] He also obtained several articles of clothing and some shoes, all of which were blood-stained.

Prior to the search of Mrs. Mincey's trailer-home, Investigator Spires arrested Jenkins, read him his rights, and took him to the LEC. Like Jones, Jenkins quickly confessed to the events that had taken place at the Mini Food Store; he blamed Mincey for everything that happened.

II.

---

[5] At the time of Mincey's arrest, the police suspected that Jenkins, whose whereabouts were still unknown, might also be inside the trailer-home. For this reason, as Mincey was placed under arrest, an officer entered the trailer-home to ensure that no one else was inside. The officer observed nothing of evidentiary value and took nothing from the residence.

[6] On May 19, 1982, the prosecution, in its response to Mincey's April 22 request for <u>Brady</u> material, disclosed that, "[w]hen the Llama pistol recovered from the defendant's trailer with a search warrant was first delivered to the Crime Lab it was not operative. It also had been cleaned and oiled since its last firing."

A.

On the afternoon of April 13, 1982, the Indigent Defense Coordinator for the Bibb County Superior Court appointed J. Robert Daniel to represent Mincey.[7]  The next day, at 4:30 p.m., a Bibb County grand jury returned a three count indictment against Mincey, Jones, and Jenkins, charging them with the murder of Paulette Riggs, the aggravated battery of Russell Peterman, and the armed robbery of the Mini Food Store.[8]  On April 22, Jones and Jenkins, pursuant to plea agreements with the Bibb County District Attorney, entered pleas of guilty in the Bibb County Superior Court.  Jones pled guilty to all three counts of the indictment, and Jenkins

---

[7] Daniel had been practicing law for over seven years in Macon, Georgia (mostly handling criminal matters) when he was appointed to represent Mincey; Daniel was a sole practitioner and was a member of the National Association of Criminal Defense Lawyers, the Georgia Association of Criminal Defense Lawyers, and the Macon Association of Criminal Defense Lawyers (of which he was a former president).  In addition to practicing law, Daniel had served as an adjunct professor of law at the Mercer School of Law (in Macon); he taught trial advocacy.  Although Daniel had not handled any capital cases, he had represented five or six persons accused of murder and had recently attended a three day seminar on defending capital cases – in both the guilt and penalty phases.

[8] The indictment charged Mincey and Jones with being habitual offenders with respect to the aggravated battery and armed robbery counts.  In 1977, Mincey and Jones had pled guilty in the Bibb County Superior Court to separate indictments charging them jointly with armed robbery.  In addition, Mincey had pled guilty to a third armed robbery offense and Jones had pled guilty to theft of automobile parts.

plead guilty to aggravated battery and armed robbery.[9] With these pleas in hand and the promises of Jones and Jenkins to testify against Mincey, the district attorney informed Daniel that the State would be seeking the death penalty against his client.[10]

At the "first pretrial hearing"[11] held in the superior court on April 23, Daniel informed the court that the State was seeking the death penalty, that he had met with Claude R. Cook, who had tried a capital case, and that Cook had agreed to serve as co-counsel.[12] Daniel also informed the court that he would be asking for

_____

[9] Jones was sentenced to life imprisonment on the murder count and ten years imprisonment on the aggravated battery count; sentencing on the armed robbery count was deferred until after Jones testified at Mincey's trial. Jenkins was sentenced to life imprisonment on the armed robbery count; sentencing on the aggravated battery count was deferred until after Jenkins testified at Mincey's trial.

[10] On April 26, the prosecutor gave defense counsel a list of the State's witnesses. Jones' and Jenkins' names were on the list.

[11] This conference was mandated by Georgia's Unified Appeal Procedure which became effective on August 25, 1980. See Ga. Code Ann. § 17-10-36 (1997); Smith v. Zant, 887 F.2d 1407, 1415 n.19 (11th Cir. 1989) (en banc).

[12] The Indigent Defense Coordinator subsequently appointed Cook as co-counsel for Mincey. Cook had been practicing law for over seven years in Macon, Georgia (half of his practice focused on criminal matters) when he was asked by Daniel to serve as co-counsel. At the time, Cook was a named partner in a three-lawyer firm and was a member of several professional organizations. At the hearing held in the Butts County Superior Court on Mincey's first petition for a writ of habeas corpus – in which Mincey alleged that Daniel and Cook had provided constitutionally ineffective assistance of counsel in defending him in the trial court and on appeal – Cook testified that he had been "involved in" approximately thirty-five criminal trials,

the appointment of a psychiatrist to examine Mincey. Daniel had learned that

Mincey was a frequent drug user, and he suspected that Mincey may have been

using acid or LSD the day of the crime.[13] He also knew that Mincey had suffered

serious "head injuries" a few years earlier and had experienced "blackouts."[14] On

---

and that, prior to representing Mincey, he had handled one capital case. In that case, an equally divided jury refused to impose the death penalty, and the court therefore sentenced the defendant to imprisonment for life.

[13] The record does not indicate how Daniel learned of Mincey's drug usage. Mincey did not testify at the hearing held in the Butts County Superior Court on his first habeas petition (or in support of the petition now before us, since the district court did not hold an evidentiary hearing). Therefore, we do not know what Mincey may have said to Daniel or Cook, if anything, about his drug usage in general or on the day of the crime. Daniel and Cook testified at the habeas hearing (having been subpoenaed by the State to testify concerning their representation of Mincey), but they were not asked, and they did not volunteer, specifically what Mincey may have told them about using drugs on the day of the crime. (They could have related what Mincey told them because, by claiming that their performance in the trial court was ineffective, Mincey had waived the attorney-client privilege. See Laughner v. United States, 373 F.2d 326, 327 (5th Cir. 1967); see also Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981)). Daniel's testimony concerning drug usage was restricted to this statement:

> [e]arly on, we thought that perhaps he had been under the influence of combined drugs; maybe including LSD. We got that suspicion from talking with him and from statements to police officers or maybe reading something in the newspaper but at some point, I learned there was drugs involved. I learned later that that was not the case and we stopped following up that lead.

[14] According to testimony given by Daniel and Cook at the evidentiary hearing before the Butts County Superior Court on Mincey's first habeas petition, see supra n.13, Mincey told them about his head injuries and blackouts very early in the case. In Mincey's April 26 petition to the trial court for an order requiring that Mincey

April 26, Daniel, using a form provided by the superior court, filed with the district attorney's office a "Petition for Psychological Examination." The petition asked that Mincey be evaluated for "[c]ompetency to stand trial" and "[r]esponsibility for actions at the time of the alleged offense." In response to a statement on the form, "[o]bservations which led to this request," Daniel inserted the following: "(1) Never injured anyone before; (2) history of drug abuse; (3) history of head injuries and blackouts." Mincey signed the form, thereby assenting to the psychological evaluation and its submission to the court. The district attorney also signed the form. On April 28, the petition was presented to the superior court. The court granted the petition and ordered that Mincey be examined for (1) "competency to stand trial" and (2) "the degree of [his] criminal responsibility" by a "qualified psychologist and/or psychiatrist," and that a report of the examination be provided to the court and counsel for the parties.

---

undergo a psychological evaluation, Daniel indicated that Mincey had a "history of head injuries and blackouts." Cook testified that, after he made his appearance in the case, he reviewed the records of the medical treatment Mincey received following a motorcycle accident in 1980 and was familiar with Mincey's subsequent mood swings. After acknowledging that he and Cook were aware of the motorcycle accident, Daniel added, "we were suspicious that perhaps [the accident] had caused some problems . . . . we were aware of a change in behavior patterns . . . after the accident. We had him evaluated and nothing came of it."

13

After the court entered this order, Daniel and Cook had second thoughts about having Mincey examined pursuant to the court order. They were concerned that, because the prosecutor would receive a copy of the examiner's report, any incriminating information that Mincey might divulge to the examiner might find its way into the report and be used against him at trial. Until they could present the matter to the court and obtain a definitive answer, they decided to postpone Mincey's court-ordered examination. Meanwhile, on April 30, Daniel moved the court for the provision of funds so that an independent mental heath expert could be employed to examine Mincey.[15] At about the same time, a psychologist, Dr. Dan Johnson, as a favor to Mincey's father, examined Mincey and reported his findings to Mincey's attorneys.[16] In his report, Dr. Johnson found no signs of organic brain damage or a basis for an insanity defense.[17]

---

[15] In their motion, counsel did not identify the mental health expert they wished to hire; they simply asked for funds, implying that if their motion were granted, they would find an expert to examine Mincey.

[16] The record does not indicate precisely when Dr. Johnson examined Mincey; by piecing several parts of the record together, we estimate that it took place before Mincey's attorneys decided that Mincey should undergo the court-ordered examination.

[17] On July 23, 1984, at a hearing in the Butts County Superior Court on Mincey's first petition for a writ of habeas corpus, Cook testified that Dr. Johnson gave them a written report of the examination and his evaluation of Mincey's condition. At the same hearing, Daniel testified that they received the results of Dr. Johnson's examination before the trial court, on April 30, entertained their motion for

14

At a pretrial conference on April 30, the court entertained several motions, one being the defendant's April 28 motion for the provision of funds for an independent psychological examination. The court deferred ruling on that motion pending the results of the court-ordered examination (if conducted).[18] On May 3, at a hearing requested by Mincey's attorneys, the court, Daniel, Mincey, and the prosecutor discussed whether, if Mincey submitted to the court-ordered examination, any incriminating information he provided the examiner could be used against him at trial and, if so, whether the court should limit the scope of the questions the examiner could put to Mincey. The court refused to limit the questions, but stated that Mincey could invoke his Fifth Amendment right against self incrimination during the examination. It reserved ruling, however, on whether Daniel could be present while the examiner questioned Mincey.

Following the May 3 hearing, Mincey's attorneys decided that Mincey should submit to the court-ordered examination. The attorneys were concerned

funds to employ an independent mental health expert. According to Daniel, Dr. Johnson's report, which is not in the record before us, contained information that would have been harmful to Mincey's case if turned over to the prosecution; for this reason, as indicated in the text infra, Dr. Johnson was not called to testify as a defense witness at either the guilt or penalty phase of Mincey's trial.

[18] The record does not indicate whether the court ruled on Mincey's request for funds for an independent psychological examination after the Central State Hospital forensic team examined Mincey and issued its report.

15

that if the examination did not go forward, they might subsequently be accused of providing constitutionally ineffective assistance of counsel. To avoid that problem, they had Mincey submit to the examination.

On May 17, the forensic team wrote the court, with copy to counsel, that it had examined Mincey and found him competent to stand trial. It also concluded that he was sane at the time of the offense. The team reached these conclusions because Mincey showed "no evidence of thought disorder," he had received "no previous psychiatric treatment or mental health care," "his speech was logical, relevant and coherent," and he was "in good contact with reality." The team's "most significant finding [was Mincey's] abuse of drugs and his history of antisocial behavior."

## B.

Georgia law recognizes the defenses of insanity and delusional compulsion.[19] To establish the former defense, the defendant must establish by a

_____

[19] Under Georgia law, a criminal defendant may plead "guilty but mentally ill." See Ga. Code Ann. § 17-7-131(b) (1997). Where a defendant has proffered evidence that he was insane or otherwise mentally incompetent at the time of the offense, the trial judge must instruct the jury that it may consider five possible verdicts: (1) guilty; (2) not guilty; (3) not guilty by reason of insanity; (4) guilty but mentally ill; (5) guilty but mentally retarded. See id. § 17-7-131(b)(1)(A)-(E); see also State v. Ball, 310 S.E.2d 516, 518 (Ga. 1984) (noting that the definition of, and jury instruction

16

preponderance of the evidence that, "at the time of the act . . . constituting the crime, [he] did not have mental capacity to distinguish between right and wrong in relation to such act . . . ." Ga. Code Ann. § 16-3-2 (1999); Grace v. Hopper, 566 F.2d 507, 510 (5th Cir. 1978) (stating that under Georgia law insanity is an affirmative defense that the defendant must prove by a preponderance of the evidence); Adams v. State, 330 S.E.2d 869, 872 (Ga. 1985) (same). To establish the latter defense, the defendant must show that "at the time of the act . . . [he], because of mental disease, injury, or congenital deficiency, acted as he did because of a delusional compulsion as to such act which overmastered his will to resist

---

concerning "guilty but mentally ill" was added in 1982 and providing the text of the law in existence prior to the date of this change.)

> A trial court may not accept
> [a] plea of guilty but mentally ill at the time of the crime . . . until the defendant has undergone examination by a licensed psychologist or psychiatrist and the court has examined the psychological or psychiatric reports, held a hearing on the issue of the defendant's mental condition, and is satisfied that there is a factual basis that the defendant was mentally ill at the time of the offense.

Ga. Code Ann.§ 17-7-131(b)(2). The term "mentally ill" is defined as "having a disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." The statute, however, excludes from the definition of mentally ill "a mental state manifested only by repeated unlawful or antisocial conduct." Ga. Code Ann. § 17-7-131(a)(2).

Finally, an insanity defense predicated on an addiction to drugs fails as a matter of law unless the defendant shows that his addiction has destroyed his ability to distinguish between right and wrong or has made him act under a delusional compulsion. See Shirley v. State, 253 S.E.2d 787, 788 (Ga. Ct. App. 1979).

17

committing the crime." Ga. Code Ann. § 16-3-3 (1999); <u>Freeman v. State</u>, 209 S.E.2d 127, 130 (Ga. Ct. App. 1974) (holding that in order to claim such a defense, the defendant must show both that the act was the result of a delusion and that the defendant acted in such a way that the facts, as he believed them to be, would have justified his act). In light of the forensic team's findings and their investigation into what occurred at the Mini Food Store on the night of the crime, Mincey's attorneys concluded that it would not be possible to establish either of these defenses. They also decided that attempting to mitigate Mincey's criminal responsibility for his acts by implying that he was strung out on acid on the night of the crime might backfire. Mincey had told someone at the jail that he had been taking acid that day and wanted to present an insanity defense based on his use of acid,[20] and counsel were concerned that if they relied on excessive drug use as an excuse for Mincey's conduct, the prosecutor would destroy their defense.[21] Thus,

---

[20] While in jail following their arrests, Mincey told Jenkins (according to Jenkins' testimony at Mincey's trial) that he would try to "cop an insanity plea" on the theory that he was "wired out on acid" when they decided to rob the Mini Food Store and when the shootings occurred. He asked Jenkins to go along with his story. After investigating the possibility that Mincey was high on LSD at the time of the shootings, his attorneys concluded that the theory had no basis in fact.

[21] At Mincey's trial, the prosecution, anticipating that Mincey's attorneys might attempt a "strung out on acid" defense, asked both Jones and Jenkins whether they had seen Mincey take any drugs at any time before they arrived at the Mini Food Store. Both said that they and Mincey had shared one marijuana cigarette; that was all. They also said that Mincey never appeared to be under the influence of drugs. In his

18

counsel's strategy in the guilt phase of the trial would be to put the State to its

proof and attempt to create a reasonable doubt as to whether Mincey, as opposed to

Jenkins, had killed Riggs (since both were carrying guns that used .38 caliber

ammunition).

Mincey went to trial on August 23, 1982. On the morning of August 26, the

jury found him guilty as charged. The penalty phase of the trial began and ended

the same day; the jury, by a unanimous vote, returned the death penalty. The court,

being bound by the verdict, then sentenced Mincey to death.[22]

---

argument to the jury at the close of the guilt phase, Daniel countered the implication of this line of questioning (that the defense would try to excuse Mincey's conduct by contending that he was high on drugs):

> We told you [in opening statement at the beginning of the trial] we weren't going to lie to you. Some of Jenkins' testimony, I suspect, was to knock out the possibility of an insanity defense. We were supposed to come in with an insanity defense, or he was wired out on acid defense, some trumped up defense. No, we haven't done that. And I hope to God I haven't suggested to y'all anything that would offend you in this summation.

[22] Under Georgia law, Ga. Code Ann. § 17-10-30 (1982), the jury was authorized to impose the death penalty if it found the existence of at least one statutory aggravating circumstance. Once it made such a finding, the jury had the discretion to choose between the death sentence or life imprisonment. See Zant v. Stephens, 297 S.E.2d 1, 3 (Ga. 1982). In Mincey's case, the jury found two statutory aggravating circumstances: (1) the offense of murder was committed by a person with a prior record of conviction for a capital felony, Ga. Code Ann. § 17-10-30(b)(1); (2) the offense of murder was committed during the commission of another capital felony (armed robbery), Ga. Code Ann. § 17-10-30(b)(2).

Mincey received a life sentence for armed robbery and a consecutive twenty-year sentence for aggravated battery.

C.

Pursuant to Georgia's unified appeal procedure, Ga. Code Ann.§ 17-10-36, Mincey appealed his convictions and death sentence to the Georgia Supreme Court. In his appeal, Mincey asserted two of the claims that we discuss in part III, infra: (1) that he was convicted on the basis of evidence obtained following a warrantless arrest proscribed by the Fourth Amendment, and (2) that he was convicted on the basis of statements he made to the police after the police denied his request for a lawyer, in violation of the Fifth Amendment.[23] The Georgia Supreme Court rejected Mincey's claims of error and affirmed. See Mincey v. State, 304 S.E.2d 882 (Ga. 1983). Mincey then petitioned the United States Supreme Court for a writ of certiorari. The Court denied his petition on November 7, 1983. See Mincey v. Georgia, 464 U.S. 977, 104 S. Ct. 414, 78 L. Ed. 2d 352 (1983), reh'g den., 464 U.S. 1064, 104 S. Ct. 749, 79 L. Ed. 2d 206 (1984).

On March 5, 1984, Mincey, represented by counsel, Michael R. Hauptman,[24] petitioned the Butts County Superior Court for a writ of habeas corpus. In his petition, Mincey claimed that his attorneys, Daniel and Cook, denied him his Sixth

---

[23] These claims were brought under the Fourteenth Amendment as well as the Fourth and Fifth Amendments. For simplicity in discussing these and Mincey's other constitutional claims, we omit reference to the Fourteenth Amendment.

[24] Hauptman practiced law in Atlanta, Georgia.

Amendment right to the effective assistance of counsel at both the guilt and penalty phases of his trial and on appeal.[25] He alleged that counsel failed to investigate the case or to call witnesses who would have provided evidence favorable to Mincey in both phases of the trial.[26] In the brief he submitted to the court in support of Mincey's petition, Hauptman was more specific concerning counsel's failures:

> There was substantial evidence that Petitioner suffered from a head injury as a result of a motorcycle collision. As a result of this collision, Petitioner had a personality change, in which he would become moody and often explode into a violent outrage. It was this very type of outrage that one of the victems [sic] testified to at trial. Notwithstanding this, counsel had a minimal psychological evaluation performed on Petitioner. Defense counsel reviewed Petitioner's medical records and he found no evidence of an [sic] neurological problems. Defense counsel based his expertise on his prior handling of personal injury claims. However, he had no formal training in this

[25] Mincey's petition also claimed that (1) the court improperly excused venire persons who were opposed to the death penalty, while permitting death penalty-prone venire persons to serve; (2) prosecutorial misconduct denied Mincey a fair trial; (3) the evidence was insufficient to establish the charged offenses beyond a reasonable doubt; and (4) the trial court admitted evidence that was highly inflammatory but of little probative value.

[26] The allegations of ineffective assistance in Mincey's petition were extremely vague, informing the court and the State of nothing more than the following: "Counsel did absolutely no investigation or preparation for . . . and failed to put up any significant evidence at the penalty phase of the trial;" "counsel failed to investigate readily available and relevant evidence that would have been admissible at both the guilt . . . [and] penalty phase of the trial;" "counsel failed to contact or call as witnesses several persons who would have been willing to testify at the guilt . . . and penalty phases of . . . trial. These persons would have testified as to mitigating evidence during the sentencing phase and evidence favorable to Petitioner's innocence during the guilt . . . phase."

highly complex area of law. Counsel did not seek a physical examination of petitioner. Nor, did counsel present any psychological experts to testify on behalf of the Petitioner. Virtually, this entire defense was left untouched. Certainly, there [can be] no more mitigating evidence than some sort of organic brain damage or mental deficiency.

The superior court held an evidentiary hearing on Mincey's petition. During the hearing, Daniel and Cook testified in response to Mincey's ineffective assistance claim. After considering their testimony and other evidence adduced, the court found no merit in Mincey's ineffective assistance claim or in any of the other allegations in the petition and, in a formal order entered on February 7, 1988, denied relief. The Georgia Supreme Court subsequently denied Mincey's application for a certificate of probable cause to appeal. On October 3, 1988, the United States Supreme Court denied his petition for a writ of certiorari. See Mincey, 488 U.S. 871, 109 S. Ct. 186, 102 L. Ed. 2d 155 (1988), reh'g den., 488 U.S. 977, 109 S. Ct. 522, 102 L. Ed. 2d 555 (1988).

On February 9, 1989, Mincey, represented by Michael Garrett and M. Elizabeth Wells,[27] petitioned the United States District Court for the Middle District of Georgia for a writ of habeas corpus. See 28 U.S.C. § 2254 (1994).[28]

---

[27] Garrett practiced law in an Augusta, Georgia; Wells practiced in Atlanta.

[28] For reasons explained infra, see n.58 and accompanying text, we apply the pre-AEDPA version of § 2254.

22

His petition included claims that he had not presented to the Georgia courts. One of those claims was that the prosecution had withheld material favorable to the defense – specifically, hand written notes the prosecutor made of a conversation he had (prior to Mincey's trial) with a member of the Central State Hospital forensic team that evaluated Mincey's competency to stand trial and his sanity at the time of the offense – in disregard of the Supreme Court's directive in Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Concluding that the Georgia courts would still adjudicate the merits of these claims, the district court dismissed Mincey's petition without prejudice for failure to exhaust his state remedies.

Accordingly, on December 7, 1989, Mincey, now being represented by James W. Purcell, Jeanne M. Hyder, Mark E. Olive, and Gary A. Alexion,[29] once again petitioned the Butts County Superior Court for habeas corpus relief. On November 30, 1993, Mincey amended his petition, and the court subsequently heard oral argument on the State's motion to dismiss the petition as successive. Of particular concern at the hearing was the question whether Mincey could have filed his Brady claim – involving the prosecutor's notes – on March 5, 1984, when he filed his first habeas petition. The court concluded that Mincey could have raised

---

[29] Purcell and Hyder practiced law in Augusta; Olive and Alexion were from the Georgia Resource Center in Atlanta.

23

his Brady claim at that time. The court further concluded that the remaining claims in Mincey's petition were barred either because, like the Brady claim, they could have been raised earlier or they had already been litigated on appeal or in the first habeas proceeding. The court, on March 3, 1994, therefore dismissed Mincey's petition on the ground that it was successive and, as such, barred by Georgia's abuse of the writ statute. See Ga. Code Ann. § 9-14-51 (1993). On October 27, 1994, the Georgia Supreme Court denied Mincey's application for a certificate of probable cause. On June 19, 1995, the United States Supreme Court denied Mincey's petition for a writ of certiorari. See Mincey v. Thomas, 515 U.S. 1147, 115 S. Ct. 2588, 132 L. Ed. 2d 836 (1995), reh'g den., 515 U.S. 1180, 116 S. Ct. 25, 132 L. Ed. 2d 907 (1995).

D.

On April 24, 1996, Mincey, having exhausted all of his claims,[30] returned to the United States District Court for the Middle District of Georgia and filed a new petition for habeas corpus relief. His petition, signed by attorneys Michael Garrett

---

[30] Some of Mincey's claims were exhausted because the Georgia courts had passed on their merits. See 28 U.S.C. § 2254(b). His remaining claims were deemed exhausted even though the Georgia courts had not passed on their merits, because Mincey no longer had the right to litigate them in state court. See 28 U.S.C. § 2254(c).

24

and M. Elizabeth Wells, contained nineteen claims of constitutional error.[31]  On

September 19, 1996, Mincey amended his petition, adding six claims, for a total of

twenty-five.[32]  After the state responded to Mincey's petition, the district court

concluded that, based on the State's response and the records of the state court

proceedings (submitted with the response),[33] it could dispose of Mincey's claims

without an evidentiary hearing, and it did so.  On May 7, 1997, the court, in a

comprehensive order, rejected each of Mincey's claims and entered judgment for

the State.[34]  Mincey thereafter moved the court pursuant to Rule 59(e) of the

Federal Rules of Civil Procedure to alter or amend its judgment.  Mincey asked the

court to revisit its holding that he had procedurally defaulted his Brady claim

---

[31] The petition contained claims bearing numbers from I through XVI and XVIII through XX.  There was no claim numbered XVII.

[32] The amended petition contained all of the claims asserted in the initial petition.  We refer hereafter to the amended petition as the petition.

[33] The district court considered the records of (1) Mincey's criminal prosecution in the Bibb County Superior Court, (2) his direct appeal to the Georgia Supreme Court, and (3) the two habeas corpus proceedings in the Butts County Superior Court.

[34] The district court did not pass on the merits of claims VI, VIII, IX, X, XI, and XIV (Mincey's Brady claim, involving the prosecutor's notes) through XXV because they were procedurally defaulted – that is, Mincey had not presented the claims to the state courts as required by Georgia law and, consequently, the state courts had not ruled on their merits – and Mincey had not demonstrated "cause" for his failure to present them and resulting "prejudice."  See Wainwright v. Sykes, 433 U.S. 72, 87, 97 S. Ct. 2497, 2506, 53 L. Ed. 2d 594 (1977).  The district court decided the merits of the remaining claims and found them insufficient as a matter of law.

25

(involving the prosecutor's notes); given an evidentiary hearing, he represented, he could show "cause" for the procedural default and resulting "prejudice."[35] On August 26, 1997, having concluded that an evidentiary hearing was unnecessary, the district court denied Mincey's Rule 59(e) motion.[36]

On September 26, 1997, Mincey appealed both the May 7 judgment and the August 26 order. A month later, the district court entered an order substituting

---

[35] In his Rule 59(e) motion to alter or amend, Mincey also asked the court to reconsider its ruling that his attorneys' performance at the trial and appellate levels of his prosecution passed constitutional muster. The motion alleged that the state habeas court's evidentiary hearing on Mincey's ineffective assistance of counsel claims was not "full and fair" within the meaning of 28 U.S.C. § 2254(d)(2), and, therefore, that the district court should hold an evidentiary hearing on these claims. The district court concluded that the state habeas hearing had been full and fair and that Mincey's motion failed to demonstrate that a new evidentiary hearing was necessary. In the court's view, Mincey's complaint was that the state courts had misapplied the standard for effective assistance of counsel established by Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), in ruling on Mincey's claims.

For ease of discussion, we treat Mincey's Rule 59(e) motion as seeking relief only on his Brady claim involving the prosecutor's notes.

[36] In his Rule 59(e) motion, Mincey acknowledged that the State's response to his petition represented that he had procedurally defaulted his Brady claim by not presenting it in the first habeas petition he presented to the Butts County Superior Court. This representation, Mincey contended (in his motion), entitled him to an evidentiary hearing on the question whether he had, in fact, defaulted the claim. The district court correctly ruled that Mincey was not entitled to an evidentiary hearing on this default issue because the Butts County Superior Court's order disposing of his second state habeas petition concluded that Mincey's Brady claim was barred as successive because he should have raised it in his first habeas petition.

26

Amy Gershenfeld Donnella and Robert Rosenthal for Garrett and Wells as

Mincey's counsel.[37]

We conclude that twenty-one of Mincey's twenty-five claims are either

procedurally defaulted (in which case we decline to address their merits) or are

meritless, and therefore, dispose of them in the margin.[38]  We review the remaining

_____

[37] Donnella has her office in St. Davids, Pennsylvania; Rosenthal's office is in New York, New York.

[38] The twenty-one claims are duplicative in part; reduced to their essentials, they are as follows: (1) The method the trial court used to draw the pool from which the grand and petit jurors were chosen was unconstitutional; (2) The trial court unduly restricted defense counsel's voir dire of the jury venire, thereby denying Mincey a fair trial; (3) The trial court improperly excused for cause venire persons who expressed reservations about capital punishment and improperly refused to excuse those venire persons who were committed to imposing the death penalty; (4) The trial court improperly excused for cause a venire person because she knew Mincey's family; (5) The prosecutor used his peremptory challenges to strike African-Americans from the venire in violation of Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986); (6) The prosecutor withheld exculpatory evidence from the defense – statements made to the police by Jones and Jenkins, a statement Durwood Shores, a prison inmate incarcerated with Mincey in 1977, made to other inmates, and statements made by two persons who possessed mitigating evidence – in violation of Brady, 373 U.S. 83, 83 S. Ct. 1194; (7) The trial court improperly allowed codefendant Jenkins to repeat a statement Mincey purportedly made to him while both were in custody, and the trial court improperly allowed a fellow prison inmate, Durwood Shores, to repeat a statement Mincey purportedly made to him while both were incarcerated in 1977; (8) The trial court improperly allowed a law enforcement officer to relate a statement codefendant Jones had made to him following his arrest – that Mincey was the trigger man; (9) The trial court improperly allowed the State to introduce unreliable identification testimony during the guilt phase of the trial; (10) The prosecutor's improper closing argument at the close of the guilt phase of the trial deprived Mincey of a fair trial; (11) The trial court improperly disallowed certain mitigating evidence Mincey proffered during the sentencing phase of the trial; (12)

27

claims in part III infra. In subpart A, we consider Mincey's claim that his

warrantless arrest violated the Fourth Amendment; therefore, Mincey contends, the

evidence thereafter seized (pursuant to a search warrant) from his mother's trailer-

home and the statements he made to the police following his arrest should have

been suppressed as fruit of a poisonous tree. In subpart B, we consider the claim

that Mincey was convicted on the basis of statements he made to the police after he

asked for, and was denied, the presence of a lawyer, in violation of the Fifth

Amendment. In subpart C, we consider whether the prosecutor denied Mincey due

process of law by not turning over to the defense prior to trial, as required by

Brady, 373 U.S. 83, 83 S. Ct. 1194, the notes he had made during a meeting with a

member of the forensic team following its evaluation of Mincey's competency to

---

The trial court improperly allowed the prosecutor to introduce impact evidence during the sentencing phase of the trial; (13) The trial court improperly allowed the state to introduce Mincey's prior convictions during the sentencing phase of the trial; (14) The prosecutor's closing argument in the sentencing phase was addressed improperly to the passion and anger of the jurors, thereby depriving Mincey of a fair sentencing proceeding; (15) The trial court's sentencing instructions to the jury were unduly confusing and restrictive and deprived Mincey of a fair sentencing proceeding; (16) The trial court relied on an unconstitutional test in denying Mincey's motion for a new trial based on newly discovered evidence.

Of the above, claims 1, 2, 5, 6, 7, 9, 10, 12, 13, 14, 15, and 16 are procedurally defaulted, as the district court correctly found, because Mincey failed to present them seasonably to the state courts in accordance with Georgia law, and he has not shown cause and resulting prejudice for such failure. See Sykes, 433 U.S. at 87, 97 S. Ct. at 2506. Claims 3, 4, 8, and 11 are meritless.

stand trial and his sanity at the time of the robbery and shootings. Finally, in

subpart D, we consider whether Mincey was denied his Sixth Amendment right to

the effective assistance of counsel during both the guilt and penalty phases of his

trial.

III.

A.

In order to review Mincey's Fourth Amendment claim, we must conclude

that he did not have a full and fair opportunity to litigate his claim in a state court

proceeding.  See Stone v. Powell, 428 U.S. 465, 96 S. Ct. 3037, 49 L. Ed. 2d 1067

(1976).  Stone instructs that

> where the state has provided an opportunity for full and fair litigation
> of a Fourth Amendment claim, a state prisoner may not be granted
> federal habeas corpus relief on the ground that evidence obtained in an
> unconstitutional search or seizure was introduced at his trial.  In this
> context the contribution of the exclusionary rule, if any, to the
> effectuation of the Fourth Amendment is minimal, and the substantial
> societal costs of application of the rule persists with special force.

Id. 428 U.S. at 494-95, 96 S. Ct. at 3052-53 (footnotes omitted).[39]

---

[39] The Supreme Court, in a footnote in its Stone decision, cited its earlier
decision in Townsend v. Sain to elaborate on the meaning of the phrase "full and fair
litigation."  See Townsend v. Sain, 372 U.S. 293, 83 S. Ct. 745, 9 L. Ed. 2d 770
(1963), overruled in part, Keeney v. Tamayo-Reyes, 504 U.S. 1, 5, 112 S. Ct. 1715,
1717, 118 L. Ed. 2d 318 (1992).  Townsend lays out certain factors for a court to

29

> For a claim to be fully and fairly considered by the state courts, where there are facts in dispute, full and fair consideration requires consideration by the fact-finding court, and at least the availability of meaningful appellate review by a higher state court. Where, however, the facts are undisputed, and there is nothing to be served by ordering a new evidentiary hearing, the full and fair consideration requirement is satisfied where the state appellate court, presented with an undisputed factual record, gives full consideration to defendant's Fourth Amendment claims.

Tukes v. Dugger, 911 F.2d 508, 513-14 (11th Cir. 1990) (quoting Morgan v. Estelle, 588 F.2d 934, 941 (5th Cir. 1979)); see also Hedden v. Wainwright, 558 F.2d 784, 786 (5th Cir. 1977).

The record in this case indicates beyond question that Mincey received a full and fair hearing in the Bibb County Superior Court on his claim that the police arrested him in violation of the Fourth Amendment and, therefore, that the evidence obtained following his arrest – the tangible evidence seized from his mother's trailer-home and the statements he made to the police – should have been suppressed as fruit of an illegal search.

Prior to trial, on July 1 and 2, 1982, the court held a hearing on his motion to suppress. Six witnesses testified at the hearing, including Mincey. Following the

---

consider in resolving whether an issue has been fully and fairly litigated. Among these factors are whether there was a hearing procedure available, how well the factual issues were developed, and whether the trial court's fact-findings are adequately supported by the record. See Townsend, 372 U.S. at 312-13, 83 S. Ct. at 757.

hearing, the court entered a written order denying his motion. The order contained comprehensive findings of fact and concluded the officers had probable cause to arrest Mincey and that, since exigent circumstances existed, they did not have to obtain an arrest warrant. On direct appeal, the Georgia Supreme Court gave full consideration to the superior court's ruling and agreed that the officers had probable cause to make the arrest. See Mincey, 304 S.E.2d at 887-89. The court did not consider whether the presence of exigent circumstances rendered a warrant unnecessary because the arrest was made in a common area of the Hill-N-Dale Trailer Park, in front of Mrs. Mincey's trailer-home. See id. at 888 (citing United States v. Watson, 423 U.S. 411, 423-24, 96 S. Ct. 820, 827-28, 46 L. Ed. 2d 598 (1976) (holding that an officer may make a warrantless arrest in a public place if the officer has probable cause to believe that the suspect has committed a felony)).

Because we have satisfied ourselves that Mincey had a full and fair opportunity to litigate his Fourth Amendment claim in the Georgia courts, we do not review it.

## B.

Mincey contends that the police obtained incriminating statements from him after he asked for a lawyer, in violation of the Fifth Amendment and the rules laid

down by <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694

(1966),[40] and <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 1884-85,

68 L. Ed. 2d 378 (1981)[41] (collectively "<u>Miranda</u> rights").  Accordingly, Mincey

argues that the trial court should have granted his motion to suppress the

statements.

1.

Unless otherwise indicated, at the pre-trial suppression hearing, the parties

did not dispute the following version of the events surrounding Mincey's

statements to the police.[42]  When Mincey was arrested outside his mother's trailer-

home, he was handcuffed and Boren placed him in the back of Spires' patrol car.

Spires drove the car and Boren sat in the back seat with Mincey.  As the three men

---

[40] <u>Miranda</u> holds that "[p]rior to any questioning . . . [a suspect] has a right to the presence of an attorney, either retained or appointed," although the suspect "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently."  <u>Miranda</u>, 384 U.S. at 444, 86 S. Ct. at 1612.

[41] <u>Edwards</u> holds that once a suspect has expressed "his desire to deal with the police only through counsel, [the suspect cannot be] subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." <u>Edwards</u>, 451 U.S. at 484-85, 101 S. Ct. at 1880.

[42] Mincey, Boren, Spires, and Deputy Sheriff Michael Smallwood were the principal witnesses at the suppression hearing.

began their drive to the LEC, Boren began advising Mincey of his <u>Miranda</u> rights.[43] Mincey interrupted him and said that he knew his rights. After the interruption, Boren read Mincey his rights in full. He then asked Mincey if he understood his rights and Mincey said that he did. At this point, Mincey claimed, and Boren and Spires denied, that he told the officers to "go ahead and run the lawyers."[44]

When the three men reached the LEC at approximately 5:15 a.m., Boren and Spires took Mincey to an investigation room; Boren then exited, leaving Spires and Mincey alone. Mincey had known Spires for five years – since 1977, when Spires questioned him about an armed robbery.

---

[43] In his testimony during the suppression hearing, and on cross-examination by Mincey's counsel at trial, Boren said that, during the trip to the LEC, he asked Mincey if he knew anything about a murder and a robbery at the Mini Food Store that evening; Mincey did not respond. It is undisputed that Boren asked this question after advising Mincey of his <u>Miranda</u> rights.

[44] When asked by his attorney what he meant by that, Mincey replied, "I needed lawyers because, you know, on this case I knew I needed one."

As soon as Boren left the room, Spires read Mincey his <u>Miranda</u> rights,[45]

using a waiver of rights form.[46]  Mincey said that he understood them.  Spires then

handed the form to Mincey and asked him to read and sign it.  Mincey read the

form, taking approximately three minutes, but refused to sign it,[47] with these

---

[45] As noted above, in the patrol car while en route to the LEC, Boren informed Mincey of his rights in Spires' presence.  Spires informed him of his rights again, he said, to ensure that Mincey understood them.

[46] The waiver of rights form read in part: [I have been informed]
1.  That I have the right to remain silent and do not have to make any statement at all.
2.  That any statement which I might make may be used against me in court.
3.  That I have the right to consult with an attorney before making any statement, and to have such attorney present with me while making a statement.
4.  That if I do not have enough money to employ an attorney, I have the right to have one appointed by the court to represent me; to consult with him before making any statement; and to have him present with me while I am making a statement.
5.  That if I request an attorney, no questions will be asked me until an attorney is present to represent me.

[47] The waiver of rights form read in part:
I, Terry Mincey, have been informed by the undersigned law enforcement officers, prior to being questioned by them, that I am suspected of the offense of murder . . . and have been informed of my rights as follows [<u>see</u> <u>supra</u> n.46] . . . .  After having my rights explained to me, I freely and voluntarily waive my rights to an attorney, I am willing to make a statement to the officers, I can read and write the English language and fully understand my rights to an attorney.  I have read this Waiver of Counsel and fully understand it.  No threats or promises have been made to me to induce me to sign this Wavier of Counsel and to make a statement to the officers.

34

words, "I'm not going to sign anything.  I signed the last time.  I'm not going to sign anything this time.  I did time the last time [referring to his encounter with Spires following the 1977 armed robbery] . . . .  You had me for armed robbery before . . . .  Man I'm looking at two murders this time.  I'm not signing anything."[48]  Spires then asked Mincey if he would sign the form if part of it were deleted Mincey pointed to the phrases "fully understand my right to an attorney" and "to make a statement to the officers," and Spires crossed them out.  Despite these deletions, Mincey still refused to sign the form.  "I told him, you know, that I needed a lawyer before I did anything."  Spires acknowledged that Mincey refused to sign the form but denied that Mincey said he needed a lawyer.  When his attorney asked him to explain why he told Spires to delete the two phrases from the form, but still refused to sign it, Mincey answered "because I knew I needed a lawyer."

After he refused to sign the waiver form, Mincey told Spires about the robbery of the Mini Food Store and the shootings; precisely what he said, however,

---

[48] Mincey admitted making a statement to that effect.  On cross-examination, Mincey was asked, "[a]s a matter of fact, you freely told [Spires] some of the things that happened out there that night, but when [he] asked you to sign, you told them 'I'm not signing this time because this time it's two murders;' isn't that right?"  To which he replied, "[i]n one part of the conversation that did come out."

was not brought out at the hearing.[49]  When asked why he was willing to discuss those events with Spires, Mincey testified at the suppression hearing, "I don't know, I just saw that I wasn't going to get a lawyer so I figured I had better talk to him because I knew him.  And I didn't too much want to talk to Boren because he was playing, you know, the rough side of it."

After Mincey spent approximately twenty minutes with Spires, Boren took him to a conference room; there, Boren and Deputy Sheriff Michael Smallwood interviewed Mincey for about forty-five minutes.  Before the interview began, Smallwood read Mincey his rights.  Mincey responded "I know my rights."  After that, Boren and Smallwood inquired about the events that had taken place at the Mini Food Store.[50]  Mincey acknowledged that he had been to the store with Jones and Jenkins and admitted shooting Peterman.[51]  When the officers asked him if he

_____

[49] At Mincey's trial, Spires testified that after he told Mincey that only one murder had taken place at the Mini Food Store – that Peterman was still alive – Mincey said "he will die.  I don't miss when I shoot one."  Mincey also said (and Spires told the jury) that he did not know why he shot the cashier and that he did not intend to harm the two teenagers whom he had encountered in the store and who later fled the scene.

[50] The investigative report that Boren filed at the conclusion of his investigation contained references concerning what Mincey said during the interview.  The court read the report prior to the suppression hearing.

[51] At Mincey's trial, Boren testified that, after he asked Mincey why he had shot Peterman, Mincey said "I just [expletive] don't know . . . . when I tell somebody to do something, I mean for them to do it.  I told him to leave, and he just acted funny

36

would give them a signed statement, Mincey replied "I'm not going to sign anything, I'm not going to give you anything, nothing written . . . I need forty-five lawyers to get out of this stuff."[52]  This was the first and only time during the interview with Boren and Smallwood that Mincey uttered the word "lawyer." After Mincey made this statement, the officers ceased their questioning.[53]

On cross-examination, Mincey testified that the forty-five lawyer comment "was a wild exaggeration, you know, nothing really specific in it," and said that "I had told them all at one time or another that I needed a lawyer.  I didn't bring it straight out and say, you know, go get me one; I just told them, you know, I felt like I needed a lawyer."  Later, in response to further cross-examination, Mincey acknowledged that he knew that he had a right to remain silent and to ask for counsel at any time during his interviews, first with Spires and then with Boren and

---

and fooled with his jacket, and I shot him."

[52] Boren was the first witness at the suppression hearing to disclose the "forty-five lawyers" comment (Smallwood and then Mincey subsequently testified that the statement was made).  Boren did so on cross-examination by Mincey's counsel. During the redirect examination that followed, the court asked Boren to read into the record what his investigative report said about the comment.  The report contained these words: "It would take forty-five lawyers to get me out of this [expletive]."

[53] At the hearing, Smallwood testified that he and Boren did not consider Mincey's statement as a request for counsel; that it was coincidental that the interrogation ceased after Mincey said that he needed forty-five lawyers; and that they would have ended the interview had Mincey asked for an attorney.

Smallwood; that his rights were read to him several times; that he was not forced to respond to the officers' questions about the events at the Mini Food Store; that his statements to the officers were made freely and voluntarily; and that he refused to sign anything because he drew a "sharp distinction" between what he was willing to say and what he was willing to sign.[54]  Finally, he answered "yes" to the question: "you knew that you had a constitutional right as an American citizen not to open your mouth and say one word without a lawyer?"

On August 13, 1982, ten days before Mincey went to trial, the court, in a written order containing findings of fact and conclusions of law, denied his motion to suppress the incriminating statements he made to Spires, Boren, and Smallwood. The court found that both Boren and Spires had read Mincey his rights and that Mincey, who was "knowledgeable due to his numerous past contacts with the law enforcement process," fully understood his rights.  That is, he understood that he had a right to the presence of counsel before the officers questioned him, or at any time during the interview, and that (with or without counsel) he had the right to remain silent.  The court found that Mincey waived both rights, and answered the officers questions, knowing that they could be used against him.  Addressing the

_____

[54] Mincey said that he refused to sign a statement because he was "not as stupid as those dumb [racial expletive]."

38

significance of Mincey's request that Spires delete certain portions of the waiver of rights form and Mincey's subsequent refusal to sign the form, the court found that such conduct did not constitute a request for counsel or an invocation of the right to remain silent; rather, it demonstrated that Mincey was simply "toying with Investigator Spires." Mincey "knew that it would be easier to deny his statements if they were not in writing and that is why he refused to sign the waiver form." The court acknowledged that Mincey indicated "in the patrol car and again at the LEC that he wanted a lawyer," but found that he "never asked for a lawyer. [He] knew if he asked, he would get one immediately . . . [and his] reference to needing 45 lawyers made towards the end of his interview [with Boren and Smallwood] was not such a request but merely an offhand remark." Given this factual background, the court concluded that Mincey's statements were made freely and voluntarily, and therefore, were admissible.

On direct appeal, the Georgia Supreme Court concluded that the trial court's findings of fact had support in the record and that the court properly concluded that Mincey's statements were made "freely and voluntarily" after a waiver of <u>Miranda</u> rights. See <u>Mincey</u>, 304 S.E.2d at 889.[55] Later, in denying Mincey habeas corpus

---

[55] The Georgia Supreme Court disposed of Mincey's claim with these words: After hearing the evidence, the trial court found that the defendant had been advised several times of his rights under <u>Miranda</u>, that he

39

relief, the district court adopted the state trial court's findings of fact, according them a presumption of correctness pursuant to 28 U.S.C. § 2254(d),[56] and also concluded that Mincey's statements were made freely and voluntarily, after being fully advised of his rights.[57]

## 2.

Mincey seeks habeas corpus relief under the provisions of 28 U.S.C. § 2254 in effect prior to the time the President signed the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-134, 110 Stat. 1214 (1996) (the "AEDPA") into law, because he filed his habeas petition before that signing took place. We agree.[58]

---

understood those rights, that he had freely and voluntarily waived those rights, and that his subsequent statements were freely and voluntarily made. These determinations by the trial court were not clearly erroneous and we must therefore accept them. Mincey, 304 S.E.2d at 889 (internal quotation marks and citations omitted).

[56] The district court presumed the trial court's findings of fact to be correct after determining that they were well supported by the evidence that had been presented to the trial court.

[57] In addition to the facts found by the state trial court, the district court found that "[t]here is no evidence that [Mincey] was bullied or tricked into answering questions, or that any promises or threats were made."

[58] Mincey and the State disagree as to whether the AEDPA, which amended portions of 28 U.S.C. § 2254, applies in this case. Mincey contends that the pre-

AEDPA standard applies while the State argues that we should apply the post-AEDPA standard outlined in Neeley v. Nagle, 138 F.3d 917 (11th Cir. 1998). Under the post-AEDPA standard, a federal court may not grant habeas relief on any claim adjudicated on the merits by a state court, unless the state proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1) (Supp. II 1996), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). In addition, the AEDPA amendments instruct federal courts to presume state court findings of fact to be correct, a presumption the petitioner can rebut only by clear and convincing evidence. See id. § 2254(e)(1).

The district court applied 28 U.S.C. § 2254, as amended by the AEDPA, to Mincey's claims and denied the writ. Arguing that the court should have applied the pre-AEDPA standard because Mincey filed his habeas petition in the district court before the AEDPA was signed into law, Mincey moved the court to alter or amend its judgment. The court side-stepped the issue of the AEDPA's application; instead, in a comprehensive order on August 26, 1997, the court concluded that it would reach the same result whether it applied a pre-AEDPA or a post-AEDPA analysis and denied Mincey's motion.

Mincey's habeas petition was stamped as filed at 9:52 a.m. on April 24, 1996 by the clerk's office of the United States District Court for the Middle District of Georgia. The effective date of the AEDPA is April 24, 1996, when the President signed the bill into law. See Lindh v. Murphy, 521 U.S. 320, 336, 117 S. Ct. 2059, 2068, 138 L. Ed. 2d 481 (1997) (holding that the Chapter 153 amendments, which apply to all federal habeas petitions, are inapplicable to federal habeas petitions pending on the date of the AEDPA's enactment). Because the AEDPA was enacted into law on the same day Mincey filed his petition, the moment the President signed the bill into law that day becomes relevant. See Burgess v. Salmon, 97 U.S. 381, 383, 24 L. Ed. 1104 (1878) (stating that presidential approval of a bill is "the earliest possible moment at which it could become a law"); United States v. Casson, 434 F.2d 415, 419 (D.C. Cir. 1970) (citing Burgess, as "controlling law on this point and follow[ing] it by deciding that [a] bill became a law at 3:05 P.M. when it was signed by the President, and not before"). We have been unable to locate, and the parties have failed to provide us with, the precise time the President signed the AEDPA, a signing that took place during a ceremony on the South Lawn of the Rose Garden

41

In this case, as noted above, the district court presumed the state trial court's findings of historical fact to be correct and adopted them as its findings of historical fact. The district court was entitled to indulge the presumption because

outside the White House. We know, however, that the AEDPA was signed in the afternoon hours of April 24, 1996. See President's Calendar, 80 Daily Tax Rep. (BNA) d46 (Apr. 25, 1996), available in Westlaw 1996 DTR 80 d46 (disclosing that "Afternoon - [President] Clinton . . . . departed the [Jefferson] hotel for the White House, where he signed the anti-terrorism bill on the South Lawn"); see also President Clinton, Remarks at meeting with President Ilyas [sic] Hrawi of Lebanon in Oval Office (Apr. 24, 1996) (transcript available at U.S. Newswire, (revealing that, in a press conference which began at 9:55 a.m. and ended fifteen minutes later, the AEDPA had not been signed yet but was being signed later that day); Matthew Dorf, PNC Decision to Amend Charter Hailed by U.S., Jewish Telegraphic Agency, Apr. 24, 1996, at 1 (reporting that President Clinton signed the anti-terrorism legislation in the afternoon); Karen Abbott, Proceedings May be Broadcast on Closed-Circuit Video Feed, Rocky Mtn. News, Apr. 24, 1996, at 12A (same). We therefore take judicial notice of the fact that the President signed the AEDPA into law on the afternoon of April 24, 1996, several hours after Mincey filed his habeas petition in the district court. See Fed. R. Evid. 201(b)(2) (stating that judicial notice may be taken when the fact in question is "one not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"); Shahar v. Bowers, 120 F.3d 211, 214 (11th Cir. 1997) (en banc) (stating by way of explanation that judicial notice may be taken of "matters of political history: for instance, who was president in 1958").

As to the Chapter 154 amendments to Title 28, which apply to capital petitioners, the State does not maintain that it has satisfied the "opt-in" requirements, see 28 U.S.C. § 2261(a)-(c) (Supp. II 1996), for those provisions of the AEDPA to apply. Accordingly, the AEDPA standard does not govern in this case. See Mills v. Singletary, 161 F.3d 1273, 1280 n.6 (11th Cir. 1998). We agree with the district court, however, that even under the pre-AEDPA standard, Mincey's request for a writ fails.

the state court held a "full, fair, and adequate hearing" on Mincey's claim (regarding the incriminating statements he made to the police) and the record before that court fairly supported its findings of fact. See 28 U.S.C. § 2254(d); Medina v. Singletary, 59 F.3d 1095, 1106 (11th Cir. 1995); Weeks v. Jones, 26 F.3d 1030, 1033-34 (11th Cir. 1994). In short, we are bound by the state court's findings of historical fact. We review de novo, however, the district court's resolution of questions of law and of mixed questions of law and fact. See Cunningham v. Zant, 928 F.2d 1006, 1011 (11th Cir. 1991).

Whether a suspect in custody has been informed of his Miranda rights is a question of fact. See United States v. Barbour, 70 F.3d 580, 584 (11th Cir. 1995). Whether Mincey knowingly and intelligently waived his rights to the presence of counsel and to remain silent, and, if so, whether his subsequent admissions to the police were voluntary are questions of law. Id. Mincey does not dispute the trial court's finding that he was fully advised of his Miranda rights and that he understood them. He knew from the outset – when Boren read him his rights in the back seat of the patrol car – that he did not have to submit to questioning and that he had the right to an attorney upon demand. Mincey contends, instead, that he did not waive his right to remain silent and his right to counsel.

43

His claim that he did not waive his right to remain silent is without merit.[59] Mincey admitted at the suppression hearing that he spoke to the officers of his own free will. As the trial court found at the conclusion of the suppression hearing, "[Mincey] was willing to talk and knew that any oral communications could be used against him. [He] also knew it would be easier to deny his statements if they were not in writing and that is why he refused to sign the waiver form." And, as the district court correctly observed, "[t]here is no evidence [in the record of the suppression hearing] that [Mincey] was bullied or tricked into answering questions, or that any promises were made."[60] Given these circumstances, it seems to us that what Mincey is really contending is that he invoked his right to the presence of counsel and that, after he did so, the officers continued their questioning.

When a suspect undergoing custodial interrogation asserts his right to counsel, the interrogation must cease. See Miranda, 384 U.S. 436 at 474, 86 S. Ct. at 1628. "Although a suspect need not speak with the discrimination of an Oxford

---

[59] Moreover, Mincey did not contend – on the basis of any ground set out in section 2254(d)(1)-(8) – that the district court should not accord the state court's fact findings a presumption of correctness.

[60] Mincey's claim that he did not waive his right to remain silent appears to be based on his refusal to sign the waiver of rights form – after he asked Spires to delete the phrases "fully understand my right to an attorney" and "to make a statement to the officers." The trial court rejected Mincey's claim, finding that, by engaging in such conduct, Mincey was simply "toying with Investigator Spires."

44

don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis v. United States, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355, 129 L. Ed. 2d 362 (1994) (internal quotation marks and citation omitted). The Court in Davis found the statement, "Maybe I should talk to a lawyer," not to be an unequivocal request for counsel. Id. at 462, 114 S. Ct. at 2357. Such a statement, the Court stated, extended Miranda's prophylactic rule too far, requiring police officers to guess whether a suspect wanted a lawyer present. The Court therefore concluded, "[i]f the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Id. at 461-62, 114 S. Ct. at 2356.

The state trial court found that Mincey "indicate[d] in the patrol car and again at the LEC that he wanted a lawyer . . . but that he never asked for a lawyer." The court was apparently referring to (1) Mincey's statement, "go ahead and run the lawyers," which Mincey claims to have made en route to the LEC, and (2) Mincey's statement to Boren and Smallwood that "it would take forty-five lawyers to get out of this [expletive]."[61] Since Boren and Smallwood (and Mincey) agree

---

[61] It is apparent from a reading of the trial court's order denying Mincey's motion to suppress that the court did not believe Mincey's testimony that, when he refused to sign the waiver of rights form, he told Spires that he "needed a lawyer

45

that the interview ended immediately after Mincey made the second statement,

Mincey's claim – that the officers (first Spires, then Boren and Smallwood)

questioned him after he asked for an attorney – turns on whether "go ahead and run

the lawyers" constituted an "unambiguous or unequivocal request for counsel."

Davis, 512 U.S. at 462, 114 S. Ct. at 2356.  Obviously, it did not.

In his brief, Mincey argues that his refusal to sign the form constituted – was

the equivalent of – an immediate demand for counsel,[62] and that Spires should have

recognized it as such.  We are not persuaded.  Although a refusal to sign a waiver

of rights form may indicate that the suspect is invoking his right to counsel, it is

not conclusive proof that he has invoked the right.  See North Carolina v. Butler,

441 U.S. 369, 375-76, 99 S. Ct. 1755, 1758-59, 60 L. Ed. 2d 286 (1979); U.S. v.

Boon San Chong, 829 F.2d 1572, 1574 (11th Cir. 1987) ("Courts have for some

time rejected the argument that a refusal to sign a waiver form automatically

renders subsequent questioning improper.").  In this case, the trial court, in

determining whether Mincey had invoked his right to counsel, gave due

consideration to his refusal to sign the waiver of rights form and found, in light of

---

before [he] did anything."  (Spires denied that Mincey made such a statement.)

[62] Mincey prefaces this argument with the observation that, because he refused to sign the waiver of rights form, he "did not explicitly waive his right[] . . . to counsel."

46

all of the surrounding circumstances, see Edwards, 451 U.S. at 482, 101 S. Ct. at 1884; Butler, 441 U.S. at 374-75, 99 S. Ct. at 1758, that he "was toying with Investigator Spires."  In addition, the court found that Mincey "drew a sharp distinction between what he was willing to say and what he was willing to sign." Mincey was willing to talk to the officers in the absence of counsel; "it would be easier [for him] to deny his statements if they were not in writing and that is why he refused to sign the waiver form."

C.

Mincey's third claim concerns a prosecutor's obligation to give the defense exculpatory evidence in his possession or under his control, as required by the Due Process Clause and Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and its progeny (the "Brady rule").  In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Id. 373 U.S. at 87, 83 S. Ct. at 1196-97.  Mincey contends that the prosecutor broke the Brady rule when he withheld from the defense notes he had made during a pretrial interview with a member of the Central State Hospital forensic team that evaluated

47

Mincey to determine his competency to stand trial and his sanity at the time of the offense.[63] In its report dated May 17, 1982, the forensic team found no evidence of mental illness: Mincey could "communicate with his lawyer[] in a sufficiently rational manner to aid in his defense and . . . [had] an understanding of the legal proceedings against him . . . . As to his criminal responsibility . . . he was able to distinguish between right and wrong and was not acting under the influence of a delusional compulsion." The forensic team's "most significant finding [was] his

---

[63] The prosecutor's notes probably constituted work product. Neither the Supreme Court nor this court has decided whether Brady requires a prosecutor to turn over his work product. See Goldberg v. United States, 425 U.S. 94, 98 n.3, 96 S. Ct. 1338, 1342 n.3, 47 L. Ed. 2d 603 (1976) (leaving open the question whether the Brady compels the prosecutor to produce notes not covered under the Jencks Act). Other courts and commentators have assumed that Brady requires disclosure. See Castlebury v. Crisp, 414 F. Supp. 945, 953 (N.D. Okla. 1976) ("[T]he 'work product' discovery rule cannot, of course, be applied in a manner which derogates a defendant's constitutional rights as propounded in Brady."); see also United States v. NYNEX Corp., 781 F. Supp. 19, 25 (D.D.C. 1991) ("Cases on this question, albeit without much discussion, suggest that internal materials possibly constituting work product may not automatically be exempt from Brady requirements.") (citing cases); United States v. Goldman, 439 F. Supp. 337, 350 (S.D.N.Y. 1977) (Of course, if [work product] material be of a Brady nature, then it must be produced."); Franklin v. State, 304 S.E.2d 501, 504 (Ga. Ct. App. 1983) ("[W]ork product of the state [is] not subject to compelled discovery except to the extent that such letter may be exculpatory and subject to disclosure under Brady." (citation omitted)); 2 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 254, at 81 & n.60 (2d ed. 1982) ("Because Brady is based on the Constitution, it overrides court-made rules of procedure. Thus the work-product immunity for discovery in Rule 16(a)(2) prohibits discovery under Rule 16 but it does not alter the prosecutor's duty to disclose material that is within Brady.").

abuse of drugs and his history of antisocial behavior." The team had "no recommendations for treatment."

After receiving a copy of the forensic team's report, the prosecutor met with the team's psychiatrist, Dr. James Craig. During that meeting, the prosecutor made some notes. The following notations, Mincey contends, would have aided his attorneys in the conduct of his case at trial, in both the guilt and penalty phases:

> D said to them on day of killing that high on quaaludes or L.S.D. –
> didn't say where got . . . .
> Said took L.S.D. and quaaludes all the time[.] Over period of time . . .
> .
> Brain damage in auto accident. Reflexes more active on 1 side. This
> indicates motor muscle power differential. It is possible he might now
> be more susceptible to irrational behavior.[64]

---

[64] These excerpts are taken directly from three photocopies of the prosecutor's handwritten notes. These photocopies were attached to the application for certificate of probable cause Mincey filed in the Georgia Supreme Court in May 1994 in an effort to obtain appellate review of the Butts County Superior Court's denial of his second habeas petition. This application (which included as attachments a photocopy of the report submitted by the Central State Hospital forensic team; a September 28, 1993 affidavit of Dr. James Larson, a clinical psychologist who evaluated Mincey in August 1993; an August 16, 1993 affidavit of Robert Jones; and a September 27, 1993 affidavit of Robert Daniel) was made part of the record on appeal in this case after the district court, on March 18, 1998, granted Mincey's motion to correct the record pursuant to Rule 10(e). See Fed. R. App. P. 10(e). We assume that the application for a certificate of probable cause was before the district court when it denied Mincey's habeas petition on May 7, 1997, and Mincey's Rule 59(e) motion to alter or amend on August 26, 1997.

Mincey raised his Brady claim for the first time in his first habeas petition to the district court. The court dismissed the petition because Mincey had not exhausted the claim (and other claims as well). Mincey thereupon returned to the Butts County Superior Court with a second habeas petition, which included his Brady claim. The superior court, however, did not consider the claim. Instead, the court dismissed the petition as successive and thus barred by Georgia law.

Following this disposition, Mincey filed a second habeas petition in the district court. The petition contained his Brady claim. It read in relevant part as follows:

CLAIM XIV

THE DISTRICT ATTORNEY . . . FAILED
TO DISCLOSE TO DEFENSE COUNSEL
EXCULPATORY INFORMATION
REGARDING PETITIONER'S MENTAL
HEALTH IN VIOLATION OF THE
FIFTH, SIXTH, EIGHTH AND
FOURTEENTH AMENDMENT [sic] TO
THE UNITED STATES CONSTITUTION.
. . .

This claim is evidenced by the following facts:
2. Mr. Mincey was denied his constitutional rights . . . when the District Attorney failed to disclose to defense counsel exculpatory information regarding [his] mental health.
3. In May, 1982, Mr. Mincey was evaluated by the out patient forensic evaluation team from Central State Hospital. The team included a psychiatrist, a psychologist and a forensic nurse. Shortly after the evaluation, the members of the team met with the District

50

Attorney . . . and reported their findings. Notes of this conversation were made and kept in the file of the District Attorney. These notes were hidden in the file of the District Attorney's file until post-conviction counsel discovered them through the State Open Records Act.

4. The hidden notes reveal that Dr. James Craig, the psychiatrist, found that Mr. Mincey suffered from brain damage which was the result of a motor vehicle accident in 1980. Specifically, the notes state:

> Brain damage in auto accident. Reflexes more active on 1 side. This indicates motor muscle power differential. It is possible he might now be more susceptible to irrational behavior.

[Notes of District Attorney]. In addition, the hidden notes indicate that Mr. Mincey was under the influence of LSD and quaaludes on the night of the crime and that he had a substantial history of LSD use.

5. In its final report to the court, via a letter dated May 17, 1982, the Central State Hospital evaluators only discussed Mr. Mincey's competency to stand trial. The letter omits any mention that Mr. Mincey suffered from brain damage and says nothing about the LSD and quaalude use on the night of the crime. Instead of commenting on the effects of Mr. Mincey's use of hallucinogenic drugs on the night of the offense, the State evaluators mention only that Mr. Mincey had abused drugs.

6. Thus, the Central State Hospital evaluators told the District Attorney that Mr. Mincey suffered from brain damage, but refused to disclose this information to the Court or to defense counsel. This action clearly violates Brady v. Maryland, 373 U.S. 83 (1963). Moreover, the District Attorney knew that the report to the court and defense counsel was misleading and had left out evidence which would have been critical to the defense of the case. Rather than fulfill its obligations to disclose this exculpatory evidence, the District Attorney hid his notes containing the real diagnosis for over eight years until they were discovered by post-conviction counsel.

8. In order to make out a successful <u>Brady</u> claim, Petitioner must show: (1) evidence in the possession of the state was not disclosed to the defense; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material. <u>Jacobs v. Singletary</u>, 952 F.2d 1282, 1288 (11th Cir. 1992). . . .  Evidence is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Kyles v. Whitley</u>, 115 S. Ct. at 1565 (quoting <u>United States v. Bagley</u>, 473 U.S. at 678).  And a "reasonable probability" is a [sic] probability sufficient to undermine confidence in the outcome." <u>United States v. Bagley</u>, 473 U.S. at 682.

9. Mr. Mincey has satisfied the <u>Jacobs</u> requirements.  Notes in the possession of the district attorney were not disclosed to Mr. Mincey until post-conviction when the Open Records Act was enacted; these notes are favorable to Mr. Mincey; these notes are material to Mr. Mincey's mental health claims.  Had this evidence been disclose to Mr. Mincey in a timely fashion, he would not have been convicted and sentenced to death.

In its response to Mincey's petition, the State represented that the Butts County Superior Court had dismissed Claim XIV because it was barred by Georgia's successive petition rule; accordingly, the State asked the district court to dismiss the claim as procedurally defaulted.  Mincey did not seek leave of court to amend his petition to allege that he had defaulted the claim but that he could show cause for the default and resulting prejudice.  Because the record demonstrated conclusively that the state superior court had dismissed Mincey's <u>Brady</u> claim as successive, the district court, honoring Georgia's procedural default rule, dismissed the claim on May 7, 1997, without reaching the merits.

52

Mincey thereafter moved the court pursuant to Rule 59(e) to alter or amend the judgment, contending that, if given an evidentiary hearing, he could demonstrate cause for the procedural default of his Brady claim and resulting prejudice. The court assumed that Mincey could show cause for defaulting the claim but that his showing of resulting prejudice was inadequate as a matter of law. The court, on August 26, 1997, therefore adhered to its earlier ruling rejecting the claim.

We review the district court's treatment of Mincey's Brady claim in two parts. First, we consider whether the court erred in dismissing the claim as procedurally defaulted when it entered its final judgment denying Mincey habeas relief. Then, we consider whether the court abused its discretion when it denied Mincey's Rule 59(e) relief.

1.

We review de novo the district court's conclusion (in its order granting the State final judgment) that Mincey procedurally defaulted his Brady claim, and therefore, it could not be disposed of on the merits under federal law. See Lusk v. Singletary, 112 F.3d 1103, 1105 (11th Cir. 1997). It is well-settled that federal habeas courts may not consider claims that have been defaulted in state court

53

pursuant to an adequate and independent state procedural rule, unless the petitioner

can show "cause" for the default and resulting "prejudice," or "a fundamental

miscarriage of justice." See Coleman v. Thompson, 501 U.S. 722, 750, 111 S. Ct.

2546, 2564-65, 115 L. Ed. 2d 640 (1991); McCoy v. Newsome, 953 F.2d 1252,

1258 (11th Cir. 1992).[65]  Under Georgia law, a prisoner seeking a writ of habeas

corpus vacating his conviction must present all of his grounds for relief in his

original petition. See Ga. Code Ann. § 9-14-51 (1993).[66]  The Georgia Supreme

Court has explained that the purpose of this procedural rule is to bar successive

petitions. See Hunter v. Brown, 223 S.E.2d 145, 146 (Ga. 1976). Moreover, we

have repeatedly recognized that not complying with this rule precludes federal

---

[65] In Coleman, the Supreme Court stated,

[i]n all cases in which a state prisoner has defaulted his federal claims in
state court pursuant to an independent and adequate state procedural rule,
federal habeas review of the claims is barred unless the prisoner can
demonstrate cause for the default and actual prejudice as a result of the
alleged violation of federal law, or demonstrate that failure to consider
the claims will result in a fundamental miscarriage of justice.

501 U.S. at 750, 111 S. Ct. at 2565.

[66] Ga. Code Ann. § 9-14-51 states that,

[a]ll grounds for relief claimed by a petitioner for a writ of habeas corpus
shall be raised by a petitioner in his original or amended petition. Any
grounds not so raised are waived unless the Constitution of the United
States or of this state otherwise requires or unless any judge to whom the
petition is assigned, on considering a subsequent petition, finds grounds
for relief asserted therein which could not reasonably have been raised
in the original or amended petition.

habeas review.  See McCoy, 953 F.2d at 1257-62; Lancaster v. Newsome, 880 F.2d 362, 372-74 (11th Cir. 1989); Presnell v. Kemp, 835 F.2d 1567, 1773 (11th Cir. 1988).  Mincey failed to comply with Georgia's successive petition rule on March 5, 1984 when he neglected to present his Brady claim in his original habeas petition to the Butts County Superior Court.  The district court was therefore precluded from addressing the merits of Mincey's Brady claim unless he showed "cause" for not raising it in his original habeas petition to the Butts County Superior Court and resulting prejudice, or that a manifest injustice would result if he were denied relief.  See Coleman, 501 U.S. at 750, 111 S. Ct. at 2564-65.

Mincey failed this test.[67] When faced with a State response that he had defaulted his Brady claim by not presenting it in his first state habeas petition, Mincey made no attempt to avoid the consequence of the default by trying to show cause and prejudice or manifest injustice in either a motion for leave to amend his petition or some other communication to the court.[68] Instead, he simply sat on his

[67] Mincey never argues that his procedurally defaulted Brady claim falls within the "narrow class of cases . . . implicating a fundamental miscarriage of justice." McCleskey v. Zant, 499 U.S. 467, 494, 111 S. Ct. 1454, 1470, 113 L. Ed. 2d 517 (1991). Had he made the argument, we would have rejected it because Mincey could not make a "a colorable showing of innocence." Id. at 495, 111 S. Ct. at 1471. The record includes a transcript of a letter Mincey sent to Jones in October 1982, shortly after the trial, when Jones was incarcerated in Jackson, Georgia and Mincey was incarcerated in Mount Vernon, Georgia. The letter was used by the State to defend against Mincey's motion for a new trial in November 1982. This letter reads in relevant part,

> I want you to know that I don't hold any hard feelings against you because in my eyes you told things as close to the truth as possible. But I think we both know that you got more than $10. . . . We just caught a bad one and now we have to build this time again. I'm sorry I got you into this [expletive], Bobby, and I want you to know that is the truth. We half-ass did a job and this is our price for mistakes."

[68] In concluding that Mincey made no attempt (prior to filing his post-judgment Rule 59(e) motion) to inform the court that he had cause for his procedural default we have not overlooked the fact that contained within his Brady claim was the allegation that the prosecutor's notes were "hidden in the District Attorney's file until post-conviction counsel discovered them through the State Open Records Act." We have considered whether this phrase constituted an allegation that Mincey had defaulted his Brady claim but had cause for the default. We conclude, however, that the phrase did nothing more than buttress his allegation that the hidden information was material to his defense and that the prosecutor had deliberately withheld it. See generally Sawyer v. Whitley, 505 U.S. 333, 338-39, 112 S. Ct. 2514, 2518-19, 120 L. Ed. 2d 269 (1992).

claim as pled in his petition.  Under the circumstances, we could hardly fault the

district court for not entertaining his claim on the merits.  In sum, we find no error

in the district court's decision to deny the claim as procedurally defaulted.


2.

Next, we consider whether the district court abused its discretion when it

refused to alter or amend the May 7 final judgment under Rule 59(e) and grant

Mincey relief on his <u>Brady</u> claim.  The decision whether to alter or amend a

judgment pursuant to Rule 59(e) is "committed to the sound discretion of the

district judge." <u>American Home Assurance Co. v. Glenn Estess & Assocs.</u>, 763

F.2d 1237, 1238-39 (11th Cir. 1985).[69]  As noted above, Mincey used his Rule

---

[69] The petitioner's burden of showing an abuse of discretion is a "difficult" one. <u>See</u> <u>Cooter & Gell v. Hartmarx Corp.</u>, 496 U.S. 384, 408, 110 S. Ct. 2447, 2462, 110 L. Ed. 2d 359 (1990).  We have stated that "[a]n abuse of discretion occurs if the judge fails to apply the proper legal standard or to follow proper procedures in making the determination, or . . . [makes] findings of fact that are clearly erroneous." <u>Hatcher v. Miller</u> (<u>In re Red Carpet Corp.</u>), 902 F.2d 883, 890 (11th Cir. 1990).  "The function of a motion to alter or amend a judgment is not to serve as a vehicle to relitigate old matters or present the case under a new legal theory . . . [or] to give the moving party another 'bite at the apple' by permitting the arguing of issues and procedures that could and should have been raised prior to judgment." <u>In re Halko</u>, 203 B.R. 668, 671-72 (Bankr. N.D. Ill. 1996) (internal quotation marks and citations omitted).  Thus, it is not an abuse of the court's discretion to deny a Rule 59(e) motion that requests an amendment that relates to a matter "that could have been raised before the judgment was entered." <u>Bannister v. Armontrout</u>, 4 F.3d 1434, 1445 (8th Cir. 1993). Moreover, the moving party will not prevail on a Rule 59(e) motion that introduces

59(e) motion to contend for the first time that, given an evidentiary hearing in the district court, he could demonstrate cause for having defaulted his Brady claim and resulting prejudice.

As cause, Mincey represented that he was not able to gain access to the prosecutor's file, which contained the notes at issue, until a 1989 Georgia Supreme Court decision, Parker v. Lee, 378 S.E.2d 677 (Ga. 1989), rendered law enforcement files available to the public through a request pursuant to the Georgia Open Record Act, Ga. Code Ann. § 50-18-72 to -76; hence, he could not have included his Brady claim in his first state habeas petition. As prejudice, Mincey represented that the information disclosed by the notes would have led to the discovery of evidence that would have enabled him to establish, in the guilt phase of the trial, that he was either insane at the time of the offense or functioning with "diminished capacity" and therefore incapable of committing malice murder; and, in the penalty phase, that his mental condition mitigated against the imposition of the death penalty. According to Mincey, the prosecutor's notes would have enabled him to show that his 1980 motorcycle accident caused brain damage and that such damage coupled with his excessive use of drugs rendered him criminally

---

previously unsubmitted evidence absent a showing that the evidence was unavailable at the time of the judgment. See Mays v. United States Postal Serv., 122 F.3d 43, 46 (11th Cir. 1997).

58

unaccountable for his actions at the Mini Food Store on the night of April 12, 1982. Alternatively, the evidence would have convinced the jury to reject the death penalty in favor of a life sentence.

The district court assumed that Mincey could demonstrate cause for his procedural default, thus eliminating the need for an evidentiary hearing on Sykes' "cause" prong.[70] It then proceeded to the question whether the evidence Mincey had proffered satisfied Sykes' "prejudice" prong – that is, whether defense counsel's possession of the prosecutor's notes would have created "a reasonable probability that the result of [his] trial would have been different if the [notes] had been disclosed to the defense." Strickler v. Greene, 527 U.S. 263, ____, 119 S. Ct. 1936, 1952, 144 L. Ed. 2d 286 (1999) (internal quotation marks omitted). Stated

---

[70] In its order denying Mincey's Rule 59(e) motion, the court stated that Mincey's inability to gain access to the prosecutor's notes until 1989 "may be sufficient to show cause for the failure to raise the claim in previous proceedings." Although the district court, for the sake of argument, gave Mincey the benefit of the doubt on the issue of "cause" for the procedural default, we have doubts that Mincey could have made a sufficient showing to overcome even this prong of the Sykes standard. See Felker v. Turpin, 101 F.3d 657, 662 (11th Cir. 1996) ( " '[C]ounsel for Petitioner could have sought this information [in the prosecutor's possession] prior to the first state habeas petition being filed in 1984,' because nothing prevented him from filing the Open Records Act lawsuit twelve years ago") (quoting with approval previous decision in state court); McCleskey v. Zant, 890 F.2d 342, 350 (11th Cir. 1989) (petitioner obtained witness' statement, presumably in prosecutor's file, pursuant to a Georgia Open Records Act request in June of 1987, before Parker was decided).

another way, " 'the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence,' " Strickler, 527 U.S. at ____, 119 S. Ct. at 1952 (quoting Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 1566, 131 L. Ed. 2d 490 (1995)), or "whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " Id. (quoting Kyles, 514 U.S. at 435, 115 S. Ct. at 1566).[71]

Mincey's proof that he was unaccountable for his actions comes in the form of an affidavit of Dr. James Larson, a clinical psychologist practicing in Pensacola, Florida. In his affidavit, which was executed on September 28, 1993 and presented to the Butts County Superior Court in support of Mincey's second habeas petition, Dr. Larson said this,

> As a result of Mr. Mincey's serious head injury suffered during his motorcycle accident in 1980, it is my opinion that at the time of the offense Terry Mincey would have met the criteria for Organic Mental Disorder, Not Otherwise Specified and probably an additional diagnosis of Organic Personality Disorder . . . . Mr. Mincey's personality changed considerably after the motorcycle accident, and

---

[71] This is clearly not a sufficiency of the evidence test. See Strickler, 527 U.S. at ____, 119 S. Ct. at 1952 ("[T]he . . . inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions.").

Mr. Mincey's behavior became unpredictable after the accident. He had difficulty with both short-term and long-term memory . . . . While today Mr. Mincey has learned to get around many of his impairments, at the time of the offense in 1982, it is my opinion that his cognitive functioning was compromised by changes caused by his documented closed head injury. The closed head injury would have altered Mr. Mincey's cognitive and personality functioning resulting in additional impairments of impulse control, increased frustration, impaired judgement, impaired memory and concentration, and increased irritability . . . . it is my opinion that Mr. Mincey's ability to control his behavior and actions on the day of the offense was seriously impaired. In addition, the stress of a robbery would have aggravated Mr. Mincey's deficits and impaired his ability to act in a rational manner.

In the final sentence of his affidavit, Dr. Larson stated that "Mr. Mincey's head injury was a significant factor in the case – a factor which when considered establishes that Mr. Mincey's actions on the night of the offense were the irrational impulsive actions of a brain damaged individual and not the actions of a cold, calculated, and premeditated murderer."[72]

a.

---

[72] General insanity is not a defense to a crime in Georgia, see Gould v. State, 309 S.E.2d 888, 892 (Ga. Ct. App. 1983); the only defenses recognized are no capacity to distinguish right from wrong at the time of the act, omission, or negligence, see Ga. Code Ann. § 16-3-2, and delusional compulsion at the time of the act, omission, or negligence constituting the crime, see id. § 16-3-3. See also supra n.19.

61

In his Rule 59(e) motion, Mincey contended that Dr. Larson's affidavit, if presented in the form of live testimony at trial, would have warranted a jury instruction (at the conclusion of the guilt phase of the trial) on the affirmative defenses of insanity or of "diminished capacity." We know of no Georgia case, however, and Mincey has cited none, that recognizes the defense of diminished capacity. As noted in part II.B. supra, Georgia does recognize, in addition to the conventional defense of insanity (the inability to distinguish right from wrong), the defense of "delusional compulsion." We, therefore, assume that in using the term diminished capacity, Mincey actually meant delusional compulsion.

Dr. Larson's testimony, as proffered, would have established neither affirmative defense. To make out an insanity defense, a defendant must prove that he did not have the "mental capacity to distinguish between right and wrong in relation to [the criminal] act" at issue. See Ga. Code Ann. § 16-3-2; see, e.g., Moore v. State, 235 S.E.2d 577, 577-78 (Ga. Ct. App. 1977) (charging the jury on an insanity defense is not required where the evidence does not indicate that the defendant lacked the mental capacity to distinguish right from wrong); Jackson v. State, 253 S.E.2d 874, 877 (Ga. Ct. App. 1979) (holding that evidence that defendant was released from his commitment at a state mental institution, that defendant was under doctor's care and on medication, and that defendant did not

remember alleged assault was insufficient to require a jury instruction on an insanity defense). Dr. Larson's testimony did not rise to the level prescribed by Georgia law. To make out a delusional compulsion defense, the defendant must prove that "because of mental disease, injury, or congenital deficiency, [he] acted as he did because of a delusional compulsion as to such act which overmastered his will to resist committing the crime." See Ga. Code Ann. § 16-3-3. The evidence must "show both that the act was the result of delusion and also that the delusion was as to a fact which, if true, would justify the act." Freeman, 209 S.E.2d at 130. It is plain to us that Dr. Larson's testimony fell far short of this mark.[73]

In sum, then, the prosecutor's failure to give Mincey his notes prior to trial did not prejudice his defense; that is, "petitioner has not convinced us that there is a reasonable probability that the jury would have returned a different verdict" had

---

[73] A limited number of states recognize an irresistible impulse insanity defense, sometimes called an impulse-control-disorder. See, e.g., Model Penal Code § 4.01(1) (1995) (providing an insanity defense where "as a result of mental disease or defect [the defendant] lacks substantial capacity to . . . conform his conduct to the requirements of the law"). Dr. Larson's testimony – that Mincey lacked the "ability to control his behavior and actions on the day of the offense" and that his actions "were the irrational impulsive actions of a brain damaged individual" – would, at best, tend to establish this defense. Georgia, however, does not recognize such a defense. See Hicks v. State, 352 S.E.2d 762, 775 (Ga. 1987); Lawrence v. State, 454 S.E.2d 446, 450 (Ga. 1995) ("Hicks . . . stands for the position that a defendant who can distinguish between right and wrong and who commits a criminal act he recognizes is wrong but which he is compelled to commit by an uncontrollable impulse or compulsion, has no insanity defense under Georgia law.").

63

the notes been disclosed. Strickler, 527 U.S. at ____, 119 S. Ct. at 1955. In other words, our confidence in the jury's verdict at the conclusion of the guilt phase of the trial is not undermined. See id. at ____, 119 S. Ct. at 1952. It follows, then, that the district court did not abuse its discretion in concluding that the prosecutor's failure to produce his notes prejudiced Mincey's case in the guilt phase by depriving him of an affirmative defense of insanity or of delusional compulsion.

b.

We now turn to the question whether the absence of the prosecutor's notes prejudiced the penalty phase of Mincey's trial. The argument here is that the notes would have lead defense counsel to hire an expert such as Dr. Larson, and that the absence of such an expert's testimony during the penalty phase deprived Mincey of a "a fair trial, understood as a trial resulting in a verdict worthy of confidence." Strickler, 527 U.S. at ____, 119 S. Ct. at 1952 (quoting Kyles, 514 U.S. at 434, 115 S. Ct. at 1556). To satisfy this deprivation-of-a-fair-trial standard, Mincey must "show that there is a reasonable probability that his . . . sentence would have been different had [the prosecutor's notes] been disclosed" to the defense. Id. at ____, 119 S. Ct. at 1955. In order to determine whether Mincey has met this "reasonable probability" test, we look to the evidence presented during the penalty phase of

64

Mincey's trial and then to the proffer of evidence Mincey made to the district court in support of his Rule 59(e) motion.

The prosecution began the penalty phase of the trial by establishing that Mincey had been convicted of three armed robberies in 1977.[74] On April 23 of that year, he robbed a Gulf gas station, a Seven-Eleven convenience store, and a Majik Market convenience store. After establishing Mincey's convictions, the prosecution called Durwood Shores to the stand; Shores had been convicted for his participation in all three offenses.[75] The Majik Market robbery took place late at night. Shores testified that, as he and Mincey were robbing the cashier at gun point, a car pulled out of the parking lot and Mincey ran outside and began shooting at the vehicle. Mincey said that "he had to shoot at the car because it had pulled up . . . . [the occupants of the vehicle] shouldn't have been out – they didn't have any business out that time of night, anyway." While imprisoned (for the armed robbery offenses), Shores and Mincey talked about committing more robberies after their release. They agreed that "if we ever did another one, we would make sure we didn't leave any witnesses behind to identify us."

---

[74] The prosecution established these convictions by introducing into evidence the indictment for each offense and Mincey's guilty pleas.

[75] Jones participated in two of the armed robberies. His conviction for those offenses made him eligible for habitual offender status, see supra n.8.

The prosecution rested its case after Shores testified. Mincey's case followed and consisted of the testimony of six witnesses: Mincey's mother, his father, who was a United Methodist minister, Mincey's two sisters, the secretary at his father's church, and a minister who was a friend of the Mincey family.[76] They portrayed Mincey as a decent person who had had a difficult childhood: because his father was a Methodist minister, his family was forced to move frequently; then in 1975, when Mincey was fifteen years old, his parents divorced and he dropped out of school. Mincey also began abusing drugs. In addition, his family testified about the effects the 1980 motorcycle accident had on Mincey's behavior.[77] We set out in the margin their testimony in this regard.[78] That

---

[76] Cook talked to twenty to twenty-five people whom he and Daniel were led to believe would make good mitigation witnesses. With the exception of those who testified, however, these people had little, if anything, to offer. As Cook testified at Mincey's first state habeas petition hearing, "several people remembered Terry [Mincey] but they didn't have anything to say . . . . It seemed like Terry was pretty much a loner."

[77] The motorcycle accident took place in July 1980, when Mincey was twenty years old. Mincey was traveling in excess of a hundred miles an hour and, although he was wearing a helmet at the time of the crash, his helmet split in two upon impact. Mincey was hospitalized for a week following the accident and his medical records indicate that he suffered a cerebral contusion and concussion, a broken collarbone, and experienced a grand mal seizure in the x-ray room.

[78] Mincey's mother testified:
Q: Do you know whether or not – and just tell us whether you know or not – whether or not at some point in Terry's life he began to have some kind of problems?

A: Well, I don't know other than when he had that motorcycle wreck in 1980.  After that his memory was not good.

. . . .

Q: Back in 1980, you mentioned about Terry's motorcycle wreck.  Prior to the motorcycle wreck had he been a pretty moody child?

A: He was always a happy child.  He was very outgoing, very obedient to me.  When I asked him to do something, I had no problem.  He would usually go ahead and do it.

. . . .

Q: After his motorcycle wreck, did you notice him having any problem with moods, being moody?

A: He was very, very moody after that.  Like I said, his memory was not good, you could tell him something, he wouldn't remember it, and real quick to get upset.

Q: Had that not been the case prior to then?

A: He was not like that before, not towards me, anyway.

Q: When you say upset, do you mean angry, or –

A: He was real easy to get mad at you if he didn't like what was said or something.  I don't really know how to explain it.

Q: Did he ever scare you when he was like that?

A: No, sir.

Q: Know whether he ever scared anybody else?

A: I have no idea.

Marsha Morgan, Mincey's sister, testified:

Q: Did you later have a falling out with him?

A: We didn't really have a falling out.  After he had his wreck he changed a lot.

Q: In 1980?

A: Yes, sir.

Q: How did he change?

A: I don't know. He was just – well, before he was kind of like, you know, lucky go free, so to speak.  I mean, you know, he was always kind of in a good humor and took life as it comes; and then he got where he was real moody and the least little thing upset him.

Q: Did you start staying away from him then?

67

testimony brought out that after the accident, Mincey's personality changed.  He became very moody, impulsive, and prone to anger.  He also had difficulty remembering things.

_____

A: Yes, sir.

Mincey's father, on direct examination, testified:

Q: Did Terry seem like a different boy when he was 16, 17 years old than when he was younger?
A: Well, I – he grew up a little, but he was still, you know, a generous, kind-hearted, loving person.  And then he had an accident, and his, I think his personality changed some after that accident that he had.
Q: How did it change?
A: Well, he got where he wasn't quite as open as he had been being and wasn't quite as friendly.  And seemed like he worried a lot.  And he couldn't remember.  He worked in a meat market, IGA's in Baxley.  And he had a hard time – he always had a good mind, could remember anything.  But he got where he couldn't – he would have to memorize the prices; and he would sit up half the night trying to figure out what a pound of hamburger cost or steak or something like that so he would know the next day.  Well, the next day he would go to the store, and they would change it on him.  And the next night he was working again the same way, trying to keep the prices.  I noticed his mind not as effective and alert as it used to be.

The prosecution, on cross-examination of Mincey's father, brought out the following:

Q: The motorcycle accident that you referred to, that was in 1980?
A: It was in July of, I believe it was July of 1980.  I'm not quite sure.
Q: At any rate, was it after the robberies of 1977?
A: I know, I'm quite aware of that, now.  I'm quite aware.  I knew you was going to ask that when I made that statement.  Yes, it was after that. But what I am saying is his personality did change after that.
Q: All right, sir.
A: I knew you would ask that.

68

Dr. Larson's affidavit, the essence of Mincey's Rule 59(e) proffer, corroborated the personality changes these witnesses described and attributed the changes to the motorcycle accident. According to Dr. Larson, after the accident, Mincey was "impulsive" and "unpredictable," and his "ability to control his behavior and actions" was "seriously impaired." Thus, "Mincey's actions on the night of the offense were the irrational, impulsive actions of a brain damaged individual, and not the actions of a cold, calculated, and premeditated murderer." The question the district court had to decide in ruling on Mincey's Rule 59(e) motion was whether expert testimony such as Dr. Larson's would have affected the outcome of the sentencing phase of Mincey's trial to the extent required by Sykes and its progeny. The district court held that it would not, and we agree.

Implicit in Dr. Larson's affidavit is the notion that, prior to the accident, Mincey was not "impulsive" and "unpredictable," and his "ability to control his behavior and actions" was not "seriously impaired." The motorcycle accident changed all of that, Dr. Larson contends; hence, but for the accident, he would not have acted as he did on the evening of April 12, 1982. Such a notion, however, is belied by the evidence, and the district court obviously perceived this. Prior to the accident, Mincey's behavior was irrational and violent. The armed robbery spree he engaged in (with Shores and Jones) on April 23, 1977, confirmed this –

69

especially the robbery of the Majik Market. There, without provocation, Mincey ran out of the market and shot at a car leaving the parking lot. His conduct on April 12, 1982 mirrored his conduct on April 23, 1977. Likewise, the shooting of Peterman and Riggs was consistent with the pact he made with Shores while in prison, that "we would make sure that we would not leave any witnesses behind to identify us."

In sum, given Mincey's consistent behavior before and after the 1980 motorcycle accident, the district court could hardly be faulted for concluding that expert testimony, such as that proffered in Dr. Larson's affidavit, would have had little, if any, persuasive effect on the jury. We therefore conclude that the district court acted well within its discretion in denying Mincey Rule 59(e) relief on his Brady claim.

D.

Finally, we address Mincey's claim that he was denied the effective assistance of counsel, guaranteed by the Sixth Amendment, during the guilt and penalty phases of his trial.

1.

70

Whether a criminal defendant has received effective assistance of counsel is a mixed question of fact and law. We review for clear error the district court's findings of the historical facts underlying the claim. See Bush v. Singletary, 988 F.2d 1082, 1089 (11th Cir. 1993). We review de novo the court's decision on the ultimate issue – whether counsel's performance passed constitutional muster. See Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991).

2.

To establish a case of ineffective assistance of counsel a petitioner must satisfy a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). When reviewing an ineffective assistance claim in a capital case, we apply this two-prong test to the penalty phase as well as the guilt phase, because a

> capital sentencing proceeding . . . is sufficiently like a trial in its adversarial format and in the existence of standards for decision . . . that counsel's role in the proceeding is comparable to counsel's role at

71

trial – to ensure that the adversarial testing process works to produce a just result under the standards governing decision.

Id. at 686-87, 104 S. Ct. at 2064 (citations omitted).

With respect to the first prong of the analysis, showing that counsel's performance was deficient, Mincey had to demonstrate that his defense attorneys' "representation fell below an objective standard of reasonableness." Id. at 688, 104 S. Ct. at 2064. We judge the performance of a defense attorney with an eye towards "prevailing professional norms." We must respect the counsel's tactical decisions if they seem "reasonable considering all the circumstances." Id., 104 S. Ct. at 2065. To that end, we give great deference to counsel's choices and make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689, 104 S. Ct. at 2065. We must also bear in mind that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Id. at 691, 104 S. Ct. at 2066. Finally, in order to prevail on Strickland's first prong, the petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. at 689, 104 S. Ct. at 2065 (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S. Ct. 158, 164, 100 L. Ed. 83 (1955)).

In addition to showing that his lawyer's performance was deficient, the petitioner must satisfy Strickland's prejudice prong; that is, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. The petitioner, however, need not show that his attorney's deficient performance "more likely than not altered the outcome in the case." Id. at 693, 104 S. Ct. at 2068. The "more likely than not" standard would be more demanding than what is required under Strickland.

Rather the correct inquiry turns on whether a "reasonable probability" exists in our minds that, had the lawyer not been constitutionally deficient in his representation, the outcome of the trial would have been different. In other words, "a reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S. Ct. at 2068. Stated yet another way, the proper inquiry under Strickland is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686, 104 S. Ct. at 2064.

Furthermore, in a capital case, where the petitioner is challenging his sentence, he satisfies the prejudice prong if he can establish that "there is a reasonable probability that, absent the errors, the sentencer – including an appellate

73

court . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695, 104 S. Ct. at 2069.

### a.

Mincey raises several claims of ineffective assistance that we do not address because we find them to be devoid of merit. They are that counsel (1) deficiently handled the pretrial motions to suppress the incriminating evidence found in Mincey's mother's trailer-home and the statements Mincey made to the police; (2) failed, at trial, to present a vigorous defense by focusing on the prosecution's inability to establish that the bullet that killed Riggs was fired by Mincey's pistol, and the possibility that Jenkins, who was carrying a revolver of the same caliber as Mincey's,[79] was the trigger man; and (3) failed to present an adequate appeal to the Georgia Supreme Court.

The state habeas court held an evidentiary hearing on Mincey's claim of ineffective assistance of counsel. In its dispositive order rejecting the claim, the court, in its findings of fact, canvassed at length the performance of Mincey's two attorneys – from the moment they entered their appearances in the trial court through the direct appeal of Mincey's convictions and death sentence. The district

---

[79] The police did not find the bullet that killed Riggs.

court accorded those findings of fact, which have ample support in the record, a presumption of correctness. In denying Mincey relief on his ineffective assistance claim, the district court, like the state habeas court, had, in addition to these findings of fact, the record of Mincey's pretrial and trial proceedings and the briefs counsel filed on direct appeal. Those records and briefs evidence the steps counsel took in Mincey's defense. On the whole, they handled the pretrial suppression hearing and executed Mincey's defense strategy (that Jenkins, not Mincey, killed Riggs) as well as one could expect given the hand they were dealt. As for the direct appeal, we find nothing that could be labeled constitutionally deficient.

b.

Mincey claims that, as a result of the head injuries he sustained in the 1980 motorcycle accident and the drugs he took on the day of the crime, he became irrational and impulsive and suffered poor judgment – such that he should not be held accountable for his actions on the night of April 12, 1982. Had his attorneys conferred with the members of the forensic team that examined him at Central State Hospital or pursued their motion for funds to hire a mental health expert,[80] he

---

[80] As noted supra, counsel did move the court for funds with which to employ an independent mental health expert (who they did not identify). The court denied their motion without prejudice to Mincey's right to pursue it after the Central State

contends, they could have devised a different trial strategy. Specifically, he argues that they could have presented the defense of "diminished capacity," if not insanity, at the guilt phase of the trial, and that the same investigative work would have produced sufficient mitigating evidence to persuade the jury to return a verdict of life imprisonment. Treating his "diminished capacity" defense as the defense of delusional compulsion, as we did in evaluating Mincey's <u>Brady</u> claim, we address Mincey's contentions in turn.

i.

Mincey argues that his trial counsel should have contacted Dr. Craig; had they done so, they would have learned what the prosecutor discovered when he conferred with Dr. Craig after receiving the forensic team's report to the court. According to the prosecutor's notes, Dr. Craig said that Mincey had suffered "brain damage" in the 1980 motorcycle accident, which was evidenced by "motor muscle power differential," and that "[i]t is possible that he might be more susceptible to irrational behavior." Whether Dr. Craig would have rendered an opinion that the brain damage diminished Mincey's capacity at the time of the offense is not

Hospital forensic team submitted its evaluation of Mincey's competency to stand trial and his sanity at the time of the offense. Mincey's grievance is that counsel should have pursued their motion.

known; a proffer of Dr. Craig's testimony is not in the record and habeas counsel has not represented that Dr. Craig would render such an opinion. We do know, however, that the forensic team concluded that, when he committed the charged offenses, Mincey "was able to distinguish between right and wrong and was not acting under the influence of a delusional compulsion." In short, we find no dereliction of duty in counsel's failure to contact Dr. Craig. Assuming that we do, we still could not conclude that Mincey satisfied Strickland's prejudice prong without knowing what Dr. Craig would say under oath.

ii.

Mincey's second contention is that counsel should have pursued their motion for funds to employ an independent mental health expert. Had they done so, they could have obtained the services of a psychologist, like Dr. Larson, whom Mincey's habeas attorneys eventually retained.

We find no unconstitutional neglect in counsel's decision not to pursue their motion for funds to employ an independent mental health expert. Their decision was reasonable when considered from the perspective of a hypothetical lawyer standing in counsel's shoes at the time. Daniel and Cook learned of Mincey's motorcycle accident very early in the case. Sensing that the injuries Mincey

77

suffered in the accident might be responsible, at least in part, for his recent behavior, and concerned that he might not be competent to stand trial, they asked the court to have him evaluated. The court granted their request, and a forensic team from Central State Hospital examined Mincey.

Meanwhile, Mincey was examined by an independent psychologist, Dr. Dan Johnson, a friend of Mincey's father.[81] Dr. Johnson found no signs of organic brain damage or severe personality disorder; he also found no basis for a defense of

---

[81] With respect to Dr. Johnson's evaluation, Daniel testified at the first state habeas proceeding that "although that evaluation was done kind of early on, it was done in contemplation of the possible penalty phase of trial." Daniel also testified that he and Cook did not pursue their motion for funds to conduct an independent medical examination of Mincey because Dr. Johnson's report answered any doubts they may have had. In his brief to this court, Mincey argues that

> [had] counsel pursued indicators pointing to [his] brain damage and drug use, temporary insanity and diminished capacity could have been proved to exonerate [him] of claims of premeditation and malice. Defense counsel neglected this line of defense entirely . . . the district court does not explain why it was reasonable for defense counsel to forgo investigations that would have yielded a defense strategy of temporary insanity to obtain an acquittal or diminished capacity to neutralize the state's assertion of premeditation at guilt-innocence.

Clearly, as explained supra in part III.C.2.a., Mincey's defense attorneys could not have made out an insanity defense (even Dr. Larson's evaluation fails to make out an insanity defense). Indeed, it might have been constitutionally ineffective for them to have substituted an insanity defense for the trial strategy they actually used because no reasonably competent lawyer, with the information then available to counsel, would have ventured down that path. In sum, Mincey's claim that he could have obtained an acquittal based on a defense of temporary insanity or diminished capacity (a non-existing defense in Georgia) is as absurd as it is meritless.

78

insanity or delusional compulsion. After receiving his report, the attorneys decided not to call Dr. Johnson as a witness – in either the guilt or penalty phase of the case – since his testimony would probably hurt Mincey's case. Moreover, if Dr. Johnson were called to the stand, the prosecution would probably be entitled to examine his report before commencing its cross-examination. For all of these reasons, Mincey's trial attorneys decided not to pursue their motion for the provision of funds to employ an independent mental health expert. They made the decision after considering that Dr. Johnson's report corroborated the forensic team's findings, and altogether foreclosed an insanity defense, and after concluding that Mincey's story – that he had been high on acid throughout the day of the crime spree – was bogus and, as such, would all but destroy a defense of insanity or delusional compulsion.[82]

Under the circumstances, we find no fault with the district court's observation that counsel's "decisions were reasonable and reflected the appropriate level of professional diligence and concern for the client's interest."

iii.

---

[82] See supra nn.20 & 21. At trial, Jones and Jenkins testified that, while they were with Mincey on the day of the crime, he smoked one marijuana cigarette and gave no indication that he was "strung out on acid."

79

Mincey concedes that Dr. Johnson's testimony would not have been helpful in either the guilt or the penalty phase of the case. What concerns him is that counsel could have found a better expert, a psychologist like Dr. Larson, to testify during the penalty phase of his trial. In his brief, Mincey argues that, had Daniel and Cook not "refused to investigate [his] mental health status and drug usage," but rather offered the jury "cohesive mitigating evidence that [Mincey's] actions on the night of the crime were the result of diminished capacity," the outcome of the penalty phase would have been different.[83] Mincey claims that testimony such as

---

[83] In Elledge v. Dugger, 823 F.2d 1439 (11th Cir. 1987), withdrawn in part, 833 F.2d 250 (11th Cir. 1987), we refined the Strickland analysis as it relates to counsel's failure to investigate and present expert testimony at the sentencing phase. We found that in order to establish an ineffective assistance of counsel claim in such a case, petitioner had to show:

> a) that it was professionally unreasonable for counsel not to investigate; b) what kind of, and how much, investigation an ordinary, reasonable lawyer would have undertaken; c) that it is reasonably probable that a reasonable investigation would have turned up an expert who would have presented testimony similar to that which was eventually adduced; and d) that it is reasonably probable that this testimony would have affected the sentence eventually imposed. Failure to meet any of these steps defeats the ineffectiveness claim.

Id. at 1446 n.15. Because counsel in this case did investigate the possibility of presenting expert testimony, but based on counsel's reasonably competent investigation decided against presenting this form of mitigating evidence, we see no need to apply the Elledge test. Had this test been applied nonetheless, Mincey, for the reasons explained in the text, would have failed to show that it was reasonably probable that Dr. Larson's testimony would have affected the sentence eventually imposed.

Dr. Larson's would have capitalized on the mental and emotional aftermath of the 1980 motorcycle accident and Mincey's drug use, thereby swaying the jury to return a life sentence rather than the death penalty.

We acknowledge that in Georgia, "unlike some other States, the jury is not instructed to . . . balance aggravating against mitigating circumstances pursuant to any special standard." Smith v. Francis, 325 S.E.2d 362, 365 (Ga. 1985) (quoting Zant v. Stephens, 462 U.S. 862, 873, 103 S. Ct. 2733, 2741, 77 L. Ed. 2d 235 (1983)). Instead, a jury may consider as a mitigating factor any evidence presented during either phase of the trial, see Spivey v. State, 246 S.E.2d 288, 290-91 (Ga. 1978), and "has the discretion, notwithstanding proof of aggravating circumstances, to sentence the defendant to life in prison for any reason satisfactory to the jury or without any reason," Smith, 325 S.E.2d at 365.[84] Furthermore, evidence of mental illness that is insufficient to sustain an insanity

---

[84] At the close of the penalty phase, the judge instructed the jury that, "[m]itigating circumstances are those which do not constitute a justification or excuse for the offense in question, but which in fairness and in mercy may be considered as extenuating or reducing the degree of moral culpability or blame." The court later added the following instruction:

> [Mincey] contends that mitigating circumstances exist. And I charge you that in considering any mitigating circumstances you may consider all the evidence in both parts of the case and determine to your satisfaction whether any mitigating circumstances exist. Whatever you members of the jury find to be mitigating is up to you. And you may find any matter having to do with this defendant or the crime to be mitigating.

defense may be offered and considered for the purpose of mitigating punishment. See Hicks v. State, 352 S.E.2d 762, 777 (Ga. 1987).

Even if we assume, for sake of discussion, that counsel could have found an expert like Dr. Larson, and that their failure to do so constituted substandard performance under Strickland, our confidence in the jury's verdict would not be undermined. See Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. Although prejudice is the second prong in the Strickland analysis, addressing it first may resolve this confidence issue, in which case it is unnecessary to delve into the amorphous analysis of whether counsel's performance was deficient.[85]

In disposing of Mincey's Brady claim, we concluded that Mincey failed to convince us that "there [was] a reasonable probability that the result of the [penalty phase of the] trial would have been different if the [prosecutor's notes] had been disclosed to the defense," Strickler, 527 U.S. at ____, 119 S. Ct. at 1952 (internal equation marks omitted), and testimony such as Dr. Larson's been available. In that the prejudice Strickler requires to overcome a procedural default

---

[85] The Supreme Court has cautioned:
The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result. Strickland, 466 U.S. at 697, 104 S. Ct. at 2069.

is the same as the prejudice <u>Strickland</u> requires to demonstrate prejudice (in the ineffective assistance context), it follows that Mincey's ineffective assistance claim must fail. Stated another way, Mincey has failed to demonstrate that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the [sentencing] proceeding would have been different." <u>See</u> <u>Strickland</u>, 466 U.S. at 694, 104 S. Ct. at 2068.[86] Regardless of whether the performance of Mincey's counsel was deficient – because they did not call an expert witness to voice an opinion like Dr. Larson's – Mincey suffered no prejudice from their performance.

IV.

_____

[86] In <u>Jackson v. Herring</u>, we said that "the prejudice prong of <u>Strickland</u> is not co-terminous with the more general prejudice requirement of <u>Wainwright v. Sykes</u>, under which a federal habeas petitioner must demonstrate that the errors 'worked to his <u>actual</u> and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions.'" 42 F.3d 1350, 1361 (11th Cir. 1995) (quoting <u>United States v. Frady</u>, 456 U.S. 152, 170, 102 S. Ct. 1584, 1596, 71 L. Ed. 2d 816 (1982)). <u>Jackson</u> served to clarify our jurisprudence in light of the fact that commentators doubted whether the standards were the same. <u>See, e.g.</u>, 28 James W. Moore et al., <u>Moore's Federal Practice</u> § 671.11[2][b] (3d ed. 1999) (citing this court's decision in <u>Hollis v. Davis</u>, 941 F.2d 1471, 1480 (11th Cir. 1991), for the proposition that "prejudice under the <u>Strickland</u> test is sufficient to establish prejudice to relieve the procedural impediment" of the <u>Sykes</u> standard (restated in <u>Frady</u>) because in <u>Hollis</u> both standards were equated without discussion). The Supreme Court's language in <u>Strickler</u>, 527 U.S. at ____, 119 S. Ct. at 1952, ends the debate. Henceforth, we shall treat the "striking linguistic parallel" of the <u>Strickler</u> and <u>Strickland</u> standards as "one and the same." <u>Prou v. United States</u>, 199 F.3d 37, 49 (1st Cir. 1999).

For the forgoing reasons, we affirm the district court's judgment and its order denying Mincey's Rule 59(e) motion to alter or amend judgment.

AFFIRMED.